**UNITED STATES of America**

v.

**Michael WOOD, Appellant, (two cases).**

**Nos. 73–1629, 74–1004.**

United States Court of Appeals,
District of Columbia Circuit.

Argued En Banc May 26, 1977.

Judgment June 29, 1979.

Opinions March 21, 1980.

Roger M. Adelman, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert,* U. S. Atty., John A. Terry, Barry W. Levine, Garey S. Stark and Regina C. McGranery, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before WRIGHT, Chief Judge, BAZELON,** Senior Circuit Judge, and McGOWAN, TAMM, LEVENTHAL,*** ROBINSON, MacKINNON, ROBB, and WILKEY, Circuit Judges.

Opinion for the Court PER CURIAM.

Separate Opinion of Circuit Judge MacKINNON in which Circuit Judge ROBB concurs.

* United States Attorney at the time the case was briefed and argued.

** Senior Circuit Judge Bazelon was Chief Judge at the time this case was argued.

*** Circuit Judge Leventhal concurred in the judgment affirming the conviction issued on June 29, 1979. He also participated and concurred in the *per curiam* opinion, which was prepared and circulated to the Court prior to his death.

Opinion Concurring in part and Dissenting in part filed by Circuit Judge, SPOTTSWOOD W. ROBINSON, III.

Concurring and Dissenting Opinion in which Chief Judge SKELLY WRIGHT joins filed by Senior Circuit Judge BAZELON.

PER CURIAM:

In this opinion the court considers the application of the rulings in its recent *en banc* opinion in *Decoster*[1] to a claim of ineffective assistance of counsel by reason of failure to provide appropriate presentation of a defense of insanity.

1. *Factual Background*

In November 1970 Michael Wood was committed to St. Elizabeths Hospital, having been acquitted by reason of insanity in the trial of two criminal charges. On the evening of February 28, 1972, Mr. Wood and three other patients at St. Elizabeths forced two nurses' assistants into a utility room, threatening one with a knife and taking from him his hospital keys and $33 in cash. The assistants were handcuffed together and locked in the utility room, and the four patients fled the hospital. In April 1972 Mr. Wood was captured by the F.B.I. and returned to St. Elizabeths.

As a result of his elopement, Mr. Wood was charged with robbery,[2] armed robbery,[3] assault with a dangerous weapon,[4] and escape from custody.[5] On January 19, 1973, a mental competency hearing was held at which Wood was ruled competent to stand trial.

1. *United States v. Decoster*, 624 F.2d 196, (D.C. Cir. 1979).

2. *See* 22 D.C. Code § 2901 (1973).

3. *See id.* at §§ 2901, 3202.

4. *See id.* at § 502.

5. *See* 18 U.S.C. § 751(a) (1976).

At trial, appellant did not contest the essential facts proved by the government. Rather, he relied solely upon the defense of insanity. At the conclusion of the two-day trial, on April 13, 1973, Wood was found guilty on two of the four charges, those of armed robbery (under the D.C.Code) and escape (U.S.Code), whereupon Wood was sentenced to three to nine years' imprisonment for the armed robbery conviction and twenty months' to five years' imprisonment for the escape conviction, to be served concurrently. On May 24, 1973, Wood filed his notice of appeal from the judgment of conviction.

After the filing of this court's opinion in *United States v. DeCoster*[6] on October 4, 1973 (*"Decoster I"*), appellant moved for a new trial on the ground that he had been denied the effective assistance of counsel. The trial court denied appellant's motion, and appellant appealed from that order. On January 3, 1974, this court ordered, *sua sponte*, that the two appeals filed by Wood—the appeal from his convictions (No. 73–1629) and the appeal from the denial of his motion for a new trial (No. 74–1004)— be consolidated for all purposes.

On September 13, 1974, the appeals were argued before a panel consisting of Chief Judge Bazelon and Judges Robinson and MacKinnon. A week later the court remanded the record to the district court for a supplemental hearing on the issue of trial counsel's preparation and investigation.

The supplemental hearing ordered by the court was held on November 8, 1974. On March 26, 1975, the district court issued its memorandum opinion, which reviewed the highlights of the testimony at the hearing and contained the following conclusions of law:

> 1. The defendant has not carried his burden of showing a substantial violation of any of the duties owed by counsel.

> *United States v. DeCoster, supra*, 159 U.S.App.D.C. at 333, 487 F.2d at 1204.

> 2. The defendant received the reasonably competent assistance of Mr. Saccardi acting as his diligent and conscientious advocate. *United States v. DeCoster, supra*, 159 U.S.App.D.C. at 331, 487 F.2d at 1202.

The parties submitted briefs to this court following the supplemental hearing, and argument was again heard by the original panel on December 17, 1975.

On March 17, 1977, the court, *sua sponte*, issued an order setting *Wood* for rehearing by the court *en banc*, on May 26, 1977, along with the rehearing in *Decoster*. The court also invited various groups to submit *amicus* briefs and directed the parties (and invited the *amici*) to address two specific issues in their briefs:

(1) Counsel's failure to seek a continuance at the start of the trial upon learning that the defense psychiatrist would not be accepted as an expert witness.

(2) The need for and role of the expert in preparing for trial as well as testifying at trial in cases involving complex issues like insanity.

The court thereafter issued orders affirming the convictions of Decoster (May 14, 1979) and appellant Wood (June 29, 1979). On July 10, 1979, the *en banc* court issued opinions in the *Decoster* case (*"Decoster III"*).

### 2. The Issues of Ineffective Assistance of Counsel

The issue presented by *Wood* and *Decoster* is whether appellants were afforded the effective assistance of counsel that is guaranteed by the Fifth and Sixth Amendments.[7] Although the cases are distinguish-

---

**6.** 159 U.S.App.D.C. 326, 487 F.2d 1197 (1973).

**7.** The Fifth Amendment states that "[n]o person shall . . . be deprived of life [or] liberty . . . without due process of law," while the Sixth Amendment more specifically provides that "the accused shall enjoy the right . . . to have the Assistance of Counsel for

his defence." An appellant's claim that he was denied the effective assistance of counsel implicates both amendments, although "[t]he Sixth Amendment has overlapping but more stringent standards than the Fifth Amendment," *Scott v. United States*, 138 U.S.App.D.C. 339, 427 F.2d 609, 610 (1970).

able on their facts—as are almost all cases raising claims of ineffective assistance of counsel—they may properly be viewed as raising the same legal issue. Upon closer examination, the cases bear other similarities as well.

Appellant in *Decoster* identified eight general areas in which he thought trial counsel's performance fell below constitutionally permissible standards. The most significant of the areas was counsel's failure to interview potential witnesses before trial.[8]

The instant appeal also raises questions concerning trial counsel's preparation for trial. In particular, appellant Wood alleges that counsel failed to conduct an adequate factual investigation[9] and failed to familiarize himself adequately with the legal principles involved in the presentation of an insanity defense.[10] In addition, as already noted, the court *sua sponte* raised the issue of counsel's failure to seek a continuance upon learning that Dr. Dabney, whom defense counsel intended to offer as an expert testifying to the existence of defendant's mental illness, would not be accepted by the court as a person qualified to give an expert opinion. Appellate counsel for the defendant have discussed this as bearing upon a general problem of lack of adequate preparation.

### 3. The Medical Testimony At Trial

At the outset of the defense case, appellant's counsel was informed by the court that it did not "customarily accept [Dr. Dabney] as an expert." The prosecutor developed the information that Dr. Dabney had been dismissed by St. Elizabeths as not fit for the practice of psychiatry in the hospital, and that he had appealed this determination and exhausted his remedies without avail. This left open the possibility that Dr. Dabney could be called as a lay witness because he had observations concerning the behavior and attitude of defendant. However, appellant's trial counsel, having learned of Dr. Dabney's dismissal at the trial, chose not to place Dr. Dabney on the stand because in his view, the defense would be harmed by the exposure of Dr. Dabney's prior background on cross-examination.

Defense counsel proceeded by calling a number of medical witnesses who had examined defendant. These were all members of the staff of St. Elizabeths Hospital. Three witnesses were psychiatrists; Drs. Palacio, Strawinsky, and Robertson; a fourth witness, Dr. Bauer, was a clinical psychologist. Without reviewing the testimony in detail, it may be stated that these witnesses had originally examined defendant in 1970–71 and had diagnosed him as schizophrenic, catatonic type. However, after Wood's elopement in February 1972, they concurred in a revision of their conclusion, and testified that as of February 1972, he was not mentally ill. The critical testimony was that of the psychiatrist Dr. Robertson. He testified that his original diagnosis was based primarily on appellant's lack of response, or slow response, to questions and on appellant's references to gun

---

**8.** The other general areas of allegedly substandard performance were (1) counsel's slowness in seeking a bond review, (2) his failure to obtain a transcript of appellant's preliminary hearing, (3) his announcement of "ready" for trial before having fully developed the defense, (4) his waiver of a jury trial, (5) his decision to allow defendant to be tried before the judge before whom Decoster's co-defendants pleaded guilty, (6) his failure to make an opening statement, and (7) his failure to see that Decoster's sentence was properly executed.

**9.** Appellant cites four examples of counsel's alleged failure to conduct an adequate factual investigation: (1) his failure promptly to obtain an independent psychiatric examination, (2) his

failure to obtain psychiatric assistance that was available and necessary for the preparation of the insanity defense, (3) his failure to investigate and use sources of lay testimony on the issue of insanity, and (4) his failure to consult with the medical witnesses that he intended to call at trial.

**10.** Appellant claims (1) that counsel was unfamiliar with the legal rules relating to expert testimony and its role and scope in an insanity trial, (2) that counsel was unaware of the rules relating to hearsay testimony by expert witnesses, and (3) that counsel was fundamentally unaware of the decisional law relating to the insanity defense in this jurisdiction.

powder and to shooting people. Also, upon arrival at the hospital, Wood scratched his arm with a sharpened tooth brush. There was also testimony that during his stay at St. Elizabeths he had engaged in a number of fights or threats. There was no question of his assaultiveness, but Dr. Robertson concluded that that in itself was not a symptom of mental illness.

Defense trial counsel, in calling Dr. Robertson to the stand, was acting on the theory that the optimal approach from the defense point of view would be an effort to suggest to the jury "that this change in diagnosis was solely motivated by the desire to remove Michael Wood from the confines of St. Elizabeths where he had become too much of a problem." [11] Accordingly, defense trial counsel probed at considerable length for the reasons for the change in Dr. Robertson's diagnosis. Dr. Robertson's testimony was that the revised diagnosis of schizophrenia was essentially based on his observation that the symptoms that had been the basis for the original diagnosis of schizophrenia (e. g., preoccupation with guns and shooting people and slowness or hesitancy or response) were not present except when appellant was in front of the doctor. He learned from a number of ward personnel that defendant did not show a preoccupation with guns while on the ward. He consulted with defendant's mother on three occasions and with his sister and found that they did not confirm the presence of those symptoms. Dr. Robertson also said that neither the mother nor the sister had told him that appellant showed any slowness or hesitancy of response. And apparently the appellant himself had told Dr. Robertson that "he really didn't believe in the shooting of all these people." (Tr. at 165.) These factors led Dr. Robertson to the net conclusion that there had been malingering, based in part on what appellant had allegedly said to the doctor.

11. Trial transcript, p. 33.

12. Remand transcript, p. 172.

### 4. Testimony of Court-Appointed Psychiatrist

A significant feature of this case developed when the court on its own motion ordered the appointment of Dr. Harold Kaufman to examine appellant and to report to the court. At appellate argument government counsel asserted that Dr. Kaufman is reputed to be a defense oriented psychiatrist. A similar assertion appears in the transcript of the remand hearing [12] and in briefs filed by the government.[13] This was not challenged by appellant or amici curiae. We have no occasion to say whether this condition would have been necessary to our ruling. Certainly it fortifies the conclusion that we have reached.

On the basis of appellant's behavior during an interview lasting from one and one-half to two hours, an examination of the records, and interviews with nursing assistants, Dr. Kaufman concluded that Wood was not suffering from a mental disorder at the time of examination, nor was he suffering from a mental disorder as of February 28, 1972. Dr. Kaufman gave detailed explanations of the basis for his conclusions, which is fairly summarized by the following excerpt from his testimony at trial:

> Well, the evidence was so firm that I believed that I had with respect to his mental condition from, let's say, January 1, 1972, having three nursing assistants completely agree that he was not particularly ill or showed manifestations of mental illness during that period. His own assertions and the coherence of his own responses to me, his rationality. The evidence was so conclusive that the rather mixed reports which existed which I was familiar with to some extent and his background would not have served to have changed my mind at all with respect to the specific question which was being placed upon me, to weigh his state of mind at the time of the offense. [Tr. 216–17]

13. Appellee's Supplemental Memorandum (filed October 20, 1975, at 3; Supplemental Memorandum of Appellee on Rehearing *En Banc,* (filed May 20, 1975), at 3.)

### 5. Applications of Rulings of Decoster III

While in *Decoster III* there were three different opinions in support of affirmance of the conviction, and there was no majority opinion for the court, it is fair to state the outcome of that case in these terms: A majority of the judges agree that the "claimed inadequacy must be a serious incompetency that falls measurably below the performance ordinarily expected of fallible lawyers." (Quoted from plurality opinion by Judge Leventhal; at 208). Although there are differences in formulation, there is no difference in substantive content in the opinion of Judge MacKinnon, which states that the defendant must show a "substantial breach" in the duty owed to defendant by counsel.

In addition, a majority of the court is of the view that defendant does bear the burden of showing that counsel's substantial breach was likely to have resulted in prejudice to appellant's case. That is the formulation in Judge Leventhal's opinion. At 208. It is necessarily included in the burden assigned to defendant in Judge MacKinnon's opinion: that defendant show that he actually "suffered unfair prejudice" as a result of counsel's breach. At 320, 321.

The court is of the view that appellant Wood does not make a showing that is sufficient under the *Decoster* rulings to lay a foundation for relief on the basis of ineffective assistance of counsel.

*Amicus curiae* stress that defense trial counsel had never before presented an insanity defense. He had prepared for the case by reading the most recent ruling of this court on the insanity defense;[14] *Law and Tactics in Federal Criminal Cases* (Shadoan, ed. 1966), which contained a chapter on the insanity defense; and materials from the Criminal Practice Institute. In addition, he reviewed the hospital records, spoke to his client, and spoke to the doctors at the hospital. So far as the trial presentation is concerned, the court is of the view

that under the circumstances that confronted him, defense counsel developed a rational theory in an effort to secure an acquittal in the face of adverse medical opinions. It was a theory that might have been successful.

Perhaps the most damaging feature of the trial from the defense point of view was the rebuttal testimony of Dr. Kaufman, called by the prosecution. It could not vigorously be asserted that this court-appointed expert was motivated by desire to remove a troublesome personality from the hospital's jurisdiction.

Dr. Kaufman's testimony negates the likelihood of any prejudice to the defendant, and indeed fairly establishes that prejudice was improbable.

In order to secure a reversal, appellant must establish some basis for believing that a different kind of preparation would have resulted in the presentation of a contrary line of testimony for the jury's consideration. It would be extraordinarily difficult, if not impossible, to bring on a psychiatrist long after the event to reconstruct a mental condition that existed in 1972. But the court-appointed psychiatrist who made his examination on October 5, 1972, felt able to give an expert opinion as to defendant's condition in February 1972.

Appellant's counsel rightly stress that defense counsel was not aware prior to trial of the dismissal from St. Elizabeths of his proposed expert witness, Dr. Dabney. This feature is troublesome. In extenuation, it should be noted that Dr. Dabney had been retained by appellant's family, in connection with other offenses, in 1971, prior to the date of offense and, of course, prior to the court's appointment of trial counsel. It was as the family-retained psychiatrist that Dr. Dabney first examined appellant in 1971.

We have no need to determine whether defense trial counsel's lack of pretrial awareness of Dr. Dabney's weaknesses fell short of the pertinent standard of effectiveness. Even if such a shortfall be as-

---

14. *United States v. Brawner*, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972).

sumed, we are clear that there has been a lack of indication that it was a likely source of prejudice to the defendant.

### 6. *Vacation of the Federal Court*

The court's order of affirmance of June 29, 1979, was based on this court's conclusion that there has been no showing of denial of effective assistance of counsel. In addition to the claim that he was denied the effective assistance of counsel, however, Wood challenges his conviction on equal protection grounds. This challenge arises out of the trial court's instruction, based upon 24 D.C.Code § 301(j) (1973), that the burden of proof on this issue of insanity falls upon the defendant. The court charged:

> The burden of proof is on the defendant to establish by a fair preponderance of the evidence that as a result of mental disease he either lacked substantial capacity to conform his conduct to the requirements of the law or lacked substantial capacity to appreciate the wrongfulness of his conduct.

The contention is that section 301(j) violates the equal protection clause in that it puts a burden on defendants in the District of Columbia that is different from that resting upon defendants in all other federal district courts. The government's brief contends that the issue of constitutionality was decided adversely to appellant in *United States v. Greene.*[15] However, the *Greene* case involved the violation of the D.C.Code, and it expressly put to one side the issue whether the burden of proof could be shifted when defendant is charged with a violation of title 18 of U.S.Code.

■ This court has now decided, in the case of *United States v. Powell,*[16] that 18 U.S.C. § 751(a) does not apply to a patient who escapes from St. Elizabeths Hospital, having been confined there upon his acquittal in a prior criminal case by reason of insanity. The *Powell* ruling is properly ap-

plied to the *Wood* case since Wood's conviction was pending appeal at the time *Powell* issued.[17] Accordingly, Wood's conviction for violating 18 U.S.C. § 751(a) is reversed.

The court recalls its mandate in order to modify its affirmance order of June 29, 1979, so as to provide that the judgment of conviction of violation of 18 U.S.C. § 751(a) is reversed, and that the sentence imposed upon conviction of 22 D.C.Code §§ 2901, 3202 is affirmed.

*So ordered.*

MacKINNON, Circuit Judge (separate opinion):

The dissenters attempt to construe "prejudice" and "likelihood of prejudice" so that the *likelihood* of prejudice will prevail, but the prevailing opinions in *Decoster* and the *per curiam* opinion here do not support such a construction. The nature of the prejudice will vary with the circumstances of each case and what is sufficient prejudice must be evaluated in the context of varying facts, so any "likelihood of prejudice" *cannot* be the ultimate test. Human imagination, and some judicial imagination, as *Decoster* proves, can always conjure up *some* far-fetched likelihood in almost any case. So just likelihood of prejudice is *not* the test.

The rule in the United States courts of law is that the prejudice that must be shown must affect the "substantial rights of the [party]." The applicable United States Statute provides:

> On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the *substantial rights* of the parties.

28 U.S.C. § 2111. (Emphasis added) The Federal Rules of Criminal Procedure provide:

---

**15.** 160 U.S.App.D.C. 21, 29, 489 F.2d 1145, 1153 (1973), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190, *rehearing denied,* 419 U.S. 1041, 95 S.Ct. 530, 42 L.Ed.2d 318 (1974).

**16.** 164 U.S.App.D.C. 104, 503 F.2d 195 (1974).

**17.** *See United States v. Snyder,* 174 U.S.App. D.C. 117, 118, 529 F.2d 871, 872 (1976).

(a) Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

(b) Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

F.R.Crim.P. 52.

So regardless of how the test is articulated it always has to add up to the same thing, to wit, that if the questioned conduct did not "affect substantial rights, [it] shall be disregarded."

Judge ROBB, Circuit Judge, concurs in the foregoing opinion.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, concurring in part and dissenting in part:

I join in the court's opinion insofar as it annuls, for inapplicability of Section 751(a), appellant's conviction of escape from Saint Elizabeths Hospital.[1] I cannot, however, accept the court's outright rejection of the claim that, for lack of effective assistance of counsel, his conviction of armed robbery should also be overturned. Measured by the Sixth Amendment,[2] the record leaves me gravely doubtful that appellant has been afforded his constitutional due; to boot, the District Court has had no opportunity to evaluate the facts in light of the principles recently laid down in *Decoster III*.[3] Like Judge Bazelon,[4] I would remand the case for that purpose.

We in this circuit are committed to the proposition that the Sixth Amendment entitles one accused of crime "to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate."[5] I believe, too, that once an accused establishes that his counsel's performance fell below that level, the Government must demonstrate the absence of ensuing prejudice,[6] and do so beyond a reasonable doubt.[7] This latter view has not prevailed; a majority of the court maintains that the accused, though ineffectively represented, must further show a likelihood of harm therefrom, and that only then does the Government face the need to disprove actual injury.[8] Tested by either precept, the instant case, I think, has yet to pass constitutional muster, and I respectfully dissent from affirmance at this juncture.

The record at numerous points reflects adversely upon the quality of the service rendered by appellant's trial counsel,[9] and two episodes were particularly serious. First, counsel planned to call only one ex-

1. Appellant was a patient at Saint Elizabeths after acquittal in a prior criminal proceeding by reason of insanity. 18 U.S.C. § 751(a) (1976) applies only when one has been confined by virtue of *conviction*. *United States v. Powell*, 164 U.S.App.D.C. 104, 105, 503 F.2d 195, 196 (1974).

2. "In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S.Const., amend. VI.

3. *United States v. Decoster (Decoster III)*, 624 F.2d 196 (D.C. Cir. *en banc* 1979).

4. Opinion of Judge Bazelon (Bazelon Op.) at 276–277.

5. This standard, formulated in *United States v. DeCoster (DeCoster I)*, 159 U.S.App.D.C. 326, 331, 487 F.2d 1197, 1202 (1973), gained the imprimatur of six judges in *Decoster III, supra* note 3: Opinion of MacKinnon, J., joined by Tamm and Robb, JJ., 199 U.S.App.D.C. at 385, 624 F.2d at 222 ("an attorney has a duty to his client to be a diligent and conscientious advocate and to provide reasonably competent assistance"); Statement of Wright, C. J., joined by Bazelon and Robinson, JJ., 199 U.S.App. D.C. at 463, 624 F.2d at 300 ("[t]he constitutional standard of effective assistance of counsel in a criminal case is the reasonably competent assistance of an attorney acting as the defendant's diligent, conscientious advocate").

6. *Decoster III, supra* note 3, Opinion of Robinson, J., 199 U.S.App.D.C. at 413–425, 624 F.2d at 250–262.

7. *Id.* at 414–415, 423, 624 F.2d at 251–252, 260.

8. Majority Opinion (Maj. Op.) 202 U.S.App. D.C. at ——, 628 F.2d at 559; *Decoster III, supra* note 3, Opinion of Leventhal, J., 199 U.S. App.D.C. at 369, 374, 624 F.2d at 206, 211 (likelihood of harm); Opinion of MacKinnon, J., 199 U.S. App.D.C. at 395, 397, 624 F.2d at 232, 234 (actual prejudice).

9. See, *e. g.*, Bazelon Op. *supra* note 4, 200 U.S.App.D.C. at —— – ——, ——, 624 F.2d at 570–571, 572.

pert who expectably would testify that appellant was mentally ill when he eloped from Saint Elizabeths. Not until the morning of the trial did counsel find out that this intended witness had been dismissed from the hospital's staff for alleged incompetence, and that for this reason the District Court would not accept him as an expert. Then, though without ostensible means of eliciting an expert opinion favorable to insanity [10]—appellant's sole defense—counsel made no effort whatever to seek a continuance. Instead, he courted the disaster that soon was to befall his client by proceeding immediately to trial.[11]

The second glaring incident occurred amid the trial. A staff psychiatrist testified that his current diagnosis was based partly on facts given him by appellant's mother. Later, at the hearing on remand,[12] the mother disputed the facts hypothesized and added that in part the psychiatrist's testimony was inaccurate.[13] Counsel, however, had not interviewed appellant's mother before trial, and consequently lost a much-needed opportunity to impeach.[14]

These inexplicable blunders, atop a generally unimpressive performance by counsel, leave me with deeply felt misgivings as to whether appellant had "the reasonably competent assistance of an attorney acting as his diligent conscientious advocate."[15] And, since insanity was the only defense presented at trial, it is not readily apparent to me that prejudice to appellant was unlikely, or that actual harm to his cause was convincingly negated. The crowning consideration is that appellant's hearing on remand was held prior to our decision in *Decoster III*, and consequently the District Court has had no opportunity to assess the case by the criteria there announced. I would therefore remand for fresh findings enabling a reliable conclusion on whether appellant's conviction of armed robbery survives the Sixth Amendment's stricture on ineffective assistance of counsel.

BAZELON, Senior Circuit Judge, with whom J. SKELLY WRIGHT, Chief Judge, joins, concurring in part [1] and dissenting in part:

For the jury to apply "our inherited ideas of moral responsibility to individuals prosecuted for crime," [2] it must be fully informed of "the defendant's mental and emotional processes and, insofar as it affects these processes, his social situation." [3] Because

---

**10.** Trial Transcript of April 13, 1973 (pt. I) at 5–8; Remand Transcript of Nov. 8, 1974 (R. Tr.) at 136–139, 191–195.

**11.** Today's majority apparently subsumes the claim of prejudice from failure to seek a continuance under the "general problem of lack of adequate preparation." Maj. Op. *supra* note 8, 202 U.S.App.D.C. at ——, 628 F.2d at 557. The majority concedes that this problem is "troublesome," *id.* at ——, 628 F.2d at 559, but concludes that it need not be addressed, because even if it rose to the level of ineffective assistance, "there has been a lack of indication that it was a likely source of prejudice to the defendant," *id.* at ——, 628 F.2d at 560. I have difficulty in imagining a clearer source of potential prejudice than the inability of counsel depending solely on insanity to present any favorable expert witness, particularly where, as here, the Government had at its disposal an array of experts prepared to testify unfavorably.

**12.** See Bazelon Op. *supra* note 4, 202 U.S.App. D.C. at ——, 628 F.2d at 571.

**13.** Transcript of April 13, 1972, (pt. II) at 165–170 (trial testimony of psychiatrist); R. Tr. at 65–66, 78–109 (remand testimony of mother).

**14.** After testifying that "quite a bit of" the psychiatrist's testimony "was not true," appellant's mother was asked whether defense counsel had interviewed her. Her reply was: "No. I had very little conversation with [counsel] . . . . I had very little conversation with him." R. Tr. at 66. See also *id.* at 195–196 (counsel's reasons for declining to call mother as witness).

**15.** See text *supra* at note 5.

**1.** I agree to the reversal of appellant's federal conviction for escape from St. Elizabeths Hospital. *See United States v. Snyder*, 529 F.2d 871 (D.C.Cir. 1976); *United States v. Powell*, 503 F.2d 195 (D.C.Cir. 1974).

**2.** *Holloway v. United States*, 148 F.2d 665, 667 (D.C.Cir.), *cert. denied*, 334 U.S. 852, 68 S.Ct. 1507, 92 L.Ed. 1774 (1945).

**3.** *Washington v. United States*, 390 F.2d 444, 453 (D.C.Cir. 1967).

the jury in this case was not so informed due to ineffective assistance of counsel in preparing and presenting the defense, I dissent.

## I.

The trial underlying the instant appeal is only one strand in a tangled web of overlapping proceedings dating back to 1968.[4] To understand the context in which appellant Wood challenges his counsel's performance, it is necessary to review these proceedings in greater detail than the majority's cursory summary permits.[5]

*Original Commitment to St. Elizabeths Hospital.* Appellant's psychiatric problems were first brought to the attention of physicians several years before trial. While Wood served as an enlisted member of the Army from 1967 to 1968, he evidenced emotional difficulties and twice slashed his wrists in apparent suicide attempts.[6] After repeated absences from duty without leave, he was given a medical discharge, in part because of what Army psychiatrists diagnosed as an "inadequate personality."[7]

In civilian life appellant's personal difficulties surfaced again almost immediately. In October 1968 he was arrested for the armed robbery of a restaurant,[8] and while out on bond for that offense, he was arrested a second time for the robbery of a grocery store.[9] When he entered pleas of guilty in both cases in May 1969 he was committed to St. Elizabeths Hospital for a competency examination.[10] There he was examined by two psychiatrists and a clinical psychologist who diagnosed his problem as catatonic schizophrenia;[11] the district court as a result found him incompetent for sentencing and vacated his two previous guilty pleas.

In September 1970, although the Hospital continued to believe Wood was suffering from catatonic schizophrenia, it advised the district court that he had regained enough understanding of himself and his surroundings to stand trial.[12] On November 12, 1970, the court accepted the Hospital's recommendation of competency, and on the same day, without a jury, found Wood not guilty by reason of insanity upon his uncon-

---

**4.** The key events that ricochetted the appellant between hospital and prison since 1968 are summarized in an Appendix at the end of this opinion.

**5.** *See United States v. Decoster,* 624 F.2d 196 (D.C. Cir., 1979) (en banc) (Bazelon, J., dissenting at 281–282) [hereinafter *Decoster III*].

**6.** Trial Transcript of April 18, 1972 (Tr. II) at 166–67; Remand Transcript of Nov. 8, 1974 (R. Tr.) at 93–94.

**7.** Tr. II at 166.

**8.** Criminal Case No. 2094–68. Wood was charged with violating 22 D.C.Code §§ 502 (assault with a dangerous weapon) and 2901 (robbery).

**9.** *Criminal Case No. 100–69.* Here the charges against Wood were based upon 22 D.C.Code §§ 502, 2901, as well as 22 D.C.Code §§ 3202 (committing crime while armed), and 3204 (carrying concealed weapon).

**10.** *See* 24 D.C.Code § 301(a) (authorizing commitment of criminal defendants for observation where their competency to stand trial is in doubt).

**11.** Tr. I at 94. The record before us discloses only the basis for the opinions offered by the psychologist and one of the psychiatrists, Dr. Bauer, a clinical psychologist whose primary duty at St. Elizabeths was to administer psychological tests, testified at trial that he interviewed and tested Wood in May 1970. The results of his examination suggested the presence of a "psychotic condition" and "symptoms of a serious mental disorder." Trial Transcript of April 12, 1973 (Tr. I) at 79–80.

Dr. Robertson, a psychiatrist on the staff at St. Elizabeths, testified at trial that he also reached the conclusion that Wood was ill, suffering from catatonic schizophrenia. This conclusion, he testified, was based on (a) Dr. Bauer's tests, (b) his own observation that Wood was slow in responding to questions, (c) Wood's preoccupation with guns ("[He] talked about loving guns, that he needed gun power and that he would shoot people and that he would rob until he got shot himself."), (d) social workers' notes in Wood's file recounting numerous childhood episodes of irrational violence and the circumstances of Wood's discharge from the army, and (e) two apparent suicide attempts by Wood within one month of his arrival at St. Elizabeths. Tr. II at 150–52; 165–67.

**12.** *See* Appendix *infra.*

tested plea of insanity.[13] The court then committed him to St. Elizabeths pursuant to 24 D.C.Code § 301(d).[14]

*First Elopement.* Appellant's time at St. Elizabeths was a troubled one, involving numerous fights, escapes and escape attempts. The first escape occurred in April 1971, when he walked away from the Hospital while making a phone call in an unguarded lobby. He was captured and returned to the Hospital shortly thereafter, but was charged with two more robberies allegedly committed while he was at large.[15]

The examinations of Wood conducted by the Hospital to determine his competency to stand trial on these new charges[16] form an important backdrop to the defense's theory at the trial underlying the present appeal.

Appellant was first examined by several members of the Hospital staff in preparation for a staff conference held on August 3, 1971.[17] At the conference he was diagnosed as still suffering from catatonic schizophrenia and found incompetent to stand trial.[18] In the succeeding months appellant was examined again,[19] and at a second staff

---

13. Tr. II at 192.

14. 24 D.C.Code § 301(d) provides that a defendant acquitted by reason of insanity "shall be committed to a hospital for the mentally ill until such time as he is eligible for release . . . ." Release may occur only after judicial authorization at a mandatory hearing held within 50 days of the commitment, 24 D.C. Code § 301(d)(2), or upon judicial approval of the hospital's certification that the defendant has recovered his sanity, will not in the reasonable future be dangerous to himself or others, and is entitled to conditional or unconditional release. 24 D.C.Code § 301(e).

15. Criminal Case No. 1168–71. Wood was charged with violating 22 D.C.Code §§ 2901, 3202, and 502. See notes 8–9 supra.

16. See note 10 supra.

17. The record discloses the examinations conducted by three staff members, Dr. Bauer testified that he did not administer psychological tests to Wood as he had done previously, see note 11 supra, but that he observed Wood's behavior in the ward during the summer of 1971 and concluded that "[Wood] was not suffering from the same symptoms which [he] had seen in the previous admission," Tr. I at 82, and that "[Wood] had somehow recovered from a condition." Tr. I at 91. Dr. Robertson testified that he conducted an examination of Wood in July 1971, and concluded that Wood "was not ill at that time." Tr. II at 172. Dr. Robertson also reported that Dr. Zinn, another staff psychiatrist, diagnosed Wood as suffering from "a character disorder and not a schizophrenia." Tr. II at 173.

18. The staff conference was conducted by Dr. Strawinsky, a psychiatrist and Director of Forensic Programs at St. Elizabeths. Although she countersigned all Hospital reports by virtue of her position, she personally examined Wood on only this one occasion. Tr. I at 94, 100–101, 126–27. Her notes from the conference stated that:

"The diagnosis of schizophrenia catatonic type, has already been established and it is *certainly* still fitting. Though we have no details of the crime, the reviews of the record indicate robbery and he is quite involved in his catatonic self image. So, undoubtedly, he could give some rational account of his charges. I have real reservations as to how he could control his inner conflicts to really cooperate and feel that his medicine should be reinstituted and he would respond as before. Should he show the same response with medication, he would probably be competent within the near future."

Tr. II at 173–74 (emphasis added). As a result of the conference, Dr. Strawinsky advised the court that Wood was incompetent to stand trial.

Because counsel did not explore what happened at the staff conference, the record does not reveal how Dr. Strawinsky responded to the contrary evaluations made by Drs. Bauer, Robertson, or Zinn, see note 17 supra, although Dr. Bauer attended the conference, Tr. I at 82; Tr. II at 173, and Dr. Robertson had conveyed his views to Dr. Strawinsky prior to the conference. Tr. II at 172. This court has previously emphasized the importance of disclosing the proceedings underlying hospital staff conference reports to show the basis for the reports and the disagreements, if any, among the hospital staff. See Thornton v. Corcoran, 407 F.2d 695 (D.C. Cir. 1969). Unfortunately, as is evident from the record in this case, either through lack of diligence on the part of attorneys or recalcitrance on the part of the hospitals, the jury is still often deprived of this crucial information in reaching its final decision.

19. The record shows that Dr. Palacio, a staff psychiatrist at St. Elizabeths, examined Wood on two or three occasions during this period, Tr. I at 60. After conferring with Dr. Bauer, reviewing Wood's records, consulting with the Hospital nursing staff, and observing Wood's general behavior on the ward, Dr. Palacio ar-

conference held on December 14, 1971, he was diagnosed once again as catatonic schizophrenic and insane at the time of his elopement in April, but presently competent to stand trial.[20] Thus, while the two conferences differed with regards to Wood's competency, both reached the same conclusion that he was suffering from a serious mental illness.

*Second Elopement.* After the district court received the Hospital's second report it ruled that Wood was competent to stand trial and set a trial date for the robberies allegedly committed while Wood was on his first elopement. Before trial could be held, however, appellant once again sought to escape from the Hospital. His first effort on February 24, 1972 was unsuccessful, and a Hospital employee was injured in the process.[21] But four days later, with the assistance of three other patients, he succeeded, and remained at large until April. It is appellant's conviction for this escape, and a robbery committed at the Hospital during the escape, that are the subject of the present appeal.

*Pretrial Proceedings.* When Wood was eventually apprehended in April, 1972, he was returned to the Hospital and placed in seclusion. The district court then called for a 60-day observation period to determine if Wood was still competent to stand trial.[22] Only eight days later,[23] the Hospital submitted its report, stating that in their view Wood was still competent. Also, in a departure from its earlier diagnosis, the Hospital now reported that Wood did not suffer from mental illness and that he had been sane at the time of his elopement two months before.[24]

A week later, in accordance with its new diagnosis, the Hospital certified appellant as sane and not dangerous and recommended that the district court order his unconditional release from the Hospital. Judge Green of the district court rejected this recommendation, however, finding on the basis of a hearing on June 7, 1972, that Wood was mentally ill and dangerous, and hence not eligible for release.[25]

rived at "the same diagnosis as [the Hospital had reached] before, as a schizophrenic, catatonic type." Tr. I at 60–61.

**20.** Drs. Palacio and Bauer attended the conference, Tr. I at 62–63; Drs. Robertson and Strawinsky did not. Tr. II at 127, 161. Dr. Bauer testified at trial that he and Dr. Palacio reaffirmed Wood's diagnosis of catatonic schizophrenia at the conference even though they did not believe "he was still suffering from that illness." Tr. I at 83–84. At trial Dr. Palacio contradicted this characterization of their views, stating that as of December 1971 he regarded Wood as "mentally sick, suffering from schizophrenia, catatonic type," Tr. I at 61–62, and that Dr. Bauer agreed with him. Tr. I at 62–63. There was no indication of these conflicting views in the Hospital's letter to the district court reporting the results of the second staff conference. *See* note 18 *supra*.

**21.** *See* Transcript of Hearing on Motion to End Seclusion in Criminal Case Nos. 1168–71 and 1261–72 (D.D.C. June 21, 1972) (Judge Aubrey Robinson) [hereinafter S.Tr.] at 4–5, 9–11.

**22.** *See* note 10 *supra*.

**23.** In my experience eight days is something of a record for St. Elizabeths to conduct a court-ordered competency examination.

**24.** Dr. Strawinsky submitted the report on behalf of the Hospital, but did not herself examine Wood. The examination was conducted by Dr. Robertson, who testified at trial that he examined Wood on April 13 and 21, 1972, and conferred with Drs. Randall, Powell, and Bauer (staff psychologists), Drs. Caesar and Strawinsky (psychiatrists), and Mr. Bennett (a nursing assistant) in preparing his diagnosis. Tr. II at 162-63. When asked to describe the basis for his conclusion that Wood did not suffer from a substantial mental disorder, Dr. Robertson stated:

First of all, he did not show the symptoms he demonstrated to me in front of anyone else but professional people, and that his family, mother and sister, did not really confirm the presence of these symptoms outside the hospital, and that, thirdly, I think that when I talked to him he himself indicated to me that he really didn't believe these thoughts and that he was just telling lies to me. He told me, frankly, that he had learned to be slick and learned that he would never have to be punished for more than one year from what he had learned in the hospital. He told some *people that the mentally ill could not be punished.* There is motive there for his malingering.

Tr. II at 167–68.

**25.** *See* S.Tr. at 24, 27–28; note 14 *supra*.

Appellant then moved to end the seclusion and handcuffs in which he had been held since his return to the Hospital in April. The district court denied this motion also, with Judge Robinson stating that Wood had presented no evidence indicating "that the steps that are being taken by St. Elizabeths Hospital are not in accord with what they know of the condition of this patient and what his propensities are."[26] Thus, at the close of the two pretrial hearings appellant remained committed to the Hospital under tight security. Judge Robinson then transferred the charges arising out of Wood's second elopement to Judge Green so that the various proceedings involving appellant could be handled in a single court[27] and Wood was assigned the counsel whose representation he challenges on this appeal.[28]

In October 1972, upon finding it "advisable to determine the mental competency of the defendant," Judge Green appointed Dr. Harold Kaufman to conduct an examination for the court's benefit.[29] Dr. Kaufman submitted his findings in November and testified at a competency hearing in January 1973. Although he could not express an opinion about appellant's condition in April 1971, the time of the first elopement,[30] Dr. Kaufman testified that Wood was presently competent and had been free of mental illness at least since the second elopement in February 1972.[31]

*Trial.* The court found Wood competent on the basis of Dr. Kaufman's testimony, and a jury trial on the second elopement charges was held on April 12th and 13th, 1973.[32] Prior to trial, counsel had subpoenaed five possible witnesses for the defense: three psychiatrists and a psychologist on the staff at St. Elizabeths, and Dr. Dabney, a psychiatrist retained by appellant's mother.[33] Of these five witnesses, counsel knew the four St. Elizabeths doctors would testify that Wood was *not* insane at the time of

26. S.Tr. at 22. At the hearing before Judge Robinson, Dr. Strawinsky testified that Wood had proved himself an escape risk, that he had befriended aggressive young patients upon his return in April, and that he had several times threatened and once assaulted Hospital staff in protesting his seclusion. *Id.* at 5–9.

27. *Id.* at 27–28. In ordering the cases transferred, Judge Robinson stated:

I don't think that two judges of this court ought to be bouncing this man back and forth.

I think there should be one prosecutor, one defense counsel, one defendant and one judge, in conjunction with one hospital and its staff who ought to determine what is in the best interest of this defendant. That is what I believe.

\*    \*    \*    \*    \*    \*

And I think we ought to get together and deal with this as a human problem and not— if he is sick, he should be treated. That is what the law requires. If he isn't sick, he should be dealt with in the criminal law. I think there is enough confusion here that we ought to straighten it out.

28. *See* R.Tr. at 120, 152–53. Wood's trial counsel had previously been appointed to represent Wood in the charges arising out of Wood's first elopement, *id.,* and had appeared on behalf of Wood at the hearing before Judge Robinson to end Wood's seclusion. S.Tr. at 3.

29. "It is evident from the language and terms of the [Court's] Order that Dr. Kaufman was appointed as an impartial expert to assist the Court, rather than specifically to assist the defense." Appellant's Original Brief at 20 n.9. *See United States v. Chavis,* 476 F.2d 1137, 1141–42 (D.C.Cir.1973) ("purpose and nature" of appointment of psychiatrist for the court is "entirely different" from appointment of an expert for the defense); *United States v. Bass,* 477 F.2d 723, 725–26 (9th Cir. 1973) (same).

30. Dr. Kaufman felt April 1971 was "too remote in time" for him to substitute his own judgment for the view Dr. Palacio expressed in the December 1971 staff conference report. Tr. II at 210–11.

31. Dr. Kaufman based his findings upon: an examination of Wood and a discussion with two nursing assistants (Kenneth Barse and Raymond Munson) lasting altogether 1½ to 2 hours, Tr. II at 203–04; his review of Dr. Palacio's December 1971 report, Tr. at 205, 207, and Dr. Robertson's April 1972 report, Tr. II at 204–05; and his conversations with Dr. Robertson, Dr. Forrest and nurse Gladys Hollback, Tr. II at 205–06, 212–13.

32. The charges against Wood arising out of his first elopement were held pending the outcome of trial, and on July 23, 1973, on motion of the government, were dismissed.

33. R.Tr. at 138.

his elopement;[34] Dr. Dabney was thus the only witness scheduled to testify affirmatively for the defense. On the morning of trial, however, counsel learned for the first time that Dr. Dabney had previously been dismissed from St. Elizabeths for alleged incompetence, and that Judge Green would not accept him as an expert witness in her court.[35] Although this left the defense without an affirmative witness,[36] counsel nevertheless did not ask for a continuance and the case thereupon went to trial.

Counsel's strategy with the remaining doctors was to attempt to show through

direct examination that they had conspired to change Wood's diagnosis after his second elopement to rid themselves of a troublesome patient.[37] Not surprisingly, execution of this strategy was severely hampered when the court warned counsel repeatedly not to impeach his own witnesses.[38] Moreover, the entire strategy backfired when two of the doctors testified they had changed their diagnoses long before Wood's escape.[39]

The government elicited further favorable prosecution testimony from these four defense witnesses[40] and called three wit-

**34.** At the remand hearing, defense counsel testified that he "knew that [the doctors'] testimony would be that they had a misdiagnosis originally and that there was no maliciousness in the intent to get [Wood] out of there, but they had mistakenly diagnosed his condition, and that there was no mental disorder, that he was aggressive and hostile and had a severe personality disorder and was extremely aggressive, but he was not nor had he ever been laboring under a condition known as catatonic type of schizophrenia." R.Tr. at 139.

**35.** The following bench exchange appears in the trial transcript:
THE COURT: I just noticed that Dr. Dabney is to be called as a witness.
I don't customarily accept him as an expert and I thought you should know that.
[TRIAL COUNSEL]: I didn't have any prior knowledge. He has been retained by the family and he has consulted with them on three occasions. It puts the defense in a bad light in not knowing until this time.
Tr. I at 5.

**36.** The prosecutor and the trial judge suggested that Dr. Dabney could be called as a lay witness, but Wood's counsel, fearing that Dr. Dabney's background would be introduced to the jury through cross-examination, decided against using him at all. Tr. I at 7–8; R.Tr. at 136–37.

**37.** In his closing statement, defense counsel argued:
Ladies and gentlemen of the jury, when you have a headache, what do you do? You take an aspirin. You have heard the testimony in this case and it is reasonable to infer from the testimony in evidence and the reasonable deductions to be drawn therefrom that when somebody becomes a headache at Saint Elizabeths, he ceases to be schizophrenic catatonic and he becomes a psychopath. And if you have a headache at Saint Elizabeths and he is giving you too much trouble and is involved in 21 fights, you get

him out of there. And the only way you can get him out of there is to change your diagnosis and you change your diagnosis from catatonic schizophrenia to no mental disorder, and that is the way to get rid of him. That is what the defense is and is attempting to prove in this case.
Tr. II at 227–28.

**38.** During trial the prosecution repeatedly objected to counsel's attempts to discredit his own witnesses, see, e. g., Tr. I at 95, 106–07, and the court often agreed, see, e. g., Tr. II at 116 ("I just don't believe you ought to [conduct direct examination] in a manner like you are trying to impeach your own witness.") Whether or not these objections were legally supportable, trial counsel eventually seemed to consider himself barred from impeaching his own witnesses. See Tr. I at 106–07; Tr. II at 112.

**39.** See note 17 supra. Counsel did not, however, press to discover at trial why these doctors had not sought to change the Hospital's diagnosis to correspond with their own.

**40.** Under prosecution questioning, Dr. Palacio testified that Wood did not have any brain damage, Tr. I at 69, that his fascination with guns and tendency to be a loner in 1971 were not necessarily indications of mental illness, id. at 71, and that if he had been told that Wood did not exhibit these symptoms in front of his family and friends he might not have diagnosed Wood as catatonic schizophrenic at all. Id. at 74. Dr. Bauer next elaborated on the testimony described at note 17 supra. Then, Dr. Strawinsky stated in response to prosecution questioning that even if Wood had suffered from catatonic schizophrenia during 1970–1971, medication administered to him during the August 1971 to February 1972 period would have sent his illness into remission. Tr. II at 133–36. And finally, on cross-examination Dr. Robertson testified that he regarded Wood as a malingerer. See note 24 supra.

nesses of its own. First, it called two nursing assistants from the Hospital,[41] who testified to the facts of the robbery and escape.[42] Then it called Dr. Kaufman, who reiterated his pretrial report and testimony that Wood was sane at the time of his offense.[43] On cross-examination trial counsel did not attempt to challenge Dr. Kaufman's motivation in making that diagnosis,[44] but instead sought to demonstrate that Dr. Kaufman had not examined all the materials relevant to Wood's past history before making his diagnosis. Dr. Kaufman denied that any of these materials would have affected his judgment.[45]

Thus, by the close of trial, the jury had heard two Hospital staff members give eyewitness testimony of Wood's offense, and had heard the experts agree that Wood was sane at the time in question.[46] The jury rejected appellant's defense and found him guilty of armed robbery and escape.[47]

*Post-trial.* In May 1973 appellant was sentenced to Lorton Penitentiary. His stay there was limited. In January 1974, pursuant to a motion by the D.C. Department of Corrections,[48] Judge Bacon of the Superior Court ruled that Wood was mentally ill and in need of treatment, and ordered his return to St. Elizabeths.[49] Appellant remained at St. Elizabeths until August 1976. That month, on motion of the Hospital,[50] Judge Block of the Superior Court ordered appellant's return to Lorton, in part because Wood refused to participate in any of the treatment programs at the hospital.

41. The government called Mr. Lorenzo Holman and Miss Emily Wims, the two nursing assistants detained by Wood and the other patients involved in the escape.

42. Tr. I at 37–40, 43–48.

43. Tr. II at 196–97. *See* at p. 566, *supra.*

44. At the remand hearing, defense counsel explained that Dr. Kaufman's lack of association with St. Elizabeths made it impossible for the defense to argue that he had participated in the alleged conspiracy to expel Wood from the Hospital. R. Tr. at 141–42.

45. *See, e. g.,* Tr. II at 215–18. Dr. Kaufman testified that:

   The evidence was so conclusive that the rather mixed reports which existed which I was familiar with to some extent and his background would not have served to have changed my mind at all with respect to the specific question which was being placed upon me, to weigh his state of mind at the time of the offense.
   Tr. II at 217.

46. Drs. Kaufman, Strawinsky and Robertson testified that Wood was sane in February 1972, *see* Tr. I at 102–03; Tr. II at 125–26, 172–73, 197; and Dr. Bauer testified that Wood had recovered by the summer of 1971. Tr. I at 91. The remaining expert, Dr. Palacio, could not offer an opinion concerning Wood's condition at the time of his offense. Tr. I at 61, 75.

47. 22 D.C.Code §§ 2901, 3202 & 18 U.S.C. § 751(a). Wood also had been charged with simple robbery (22 D.C.Code § 2901) and assault with a deadly weapon (22 D.C.Code § 502).

48. *See* 24 D.C.Code § 302:

   Any person while serving sentence of any court of the District of Columbia for crime, in a District of Columbia penal institution, and who, in the opinion of the Director of the Department of Corrections of the District of Columbia, is mentally ill, shall be referred by such Director to [the designated government psychiatrist], and if such psychiatrist certifies that the person is mentally ill, this shall be sufficient to authorize the Director to transfer such person to a hospital for the mentally ill to receive care and treatment during the continuance of his mental illness.

49. These proceedings are referred to in a later Order issued by Judge Block. *See* Findings of Fact, Conclusions of Law and Order in Prisoner Transfer No. 2–74 [hereinafter Prisoner Transfer Findings] at 1–2 (D.C. Superior Ct. Aug. 18, 1976). According to Judge Block's order, Judge Bacon relied upon a Certificate of Psychiatrist filed by Dr. Alec Whyte, a Department of Corrections psychiatrist, which stated: "[I]n my opinion [Wood] is mentally ill suffering from schizophrenic reaction, paranoid type and because of such illness is likely to injure himself or cause substantial disruption of prison routine."

50. *See* 24 D.C.Code § 303(b):

   When any person confined in a hospital for the mentally ill while serving sentence shall be restored to mental health within the opinion of the superintendent of the hospital, the superintendent shall certify such fact to the Director of the Department of Corrections of the District of Columbia and such certification shall be sufficient to deliver such person to such Director according to his request.

Judge Block issued his order notwithstanding testimony from two psychiatrists that Wood was "schizophrenic and therefore mentally ill" and from a third psychiatrist that Wood "had a severe borderline personality disorder [and was on the] boundary between personality disorder and mental illness." [51]

Prior to Wood's transfer back to prison, a panel of this court in September 1974 ordered a remand for "a supplemental hearing on trial counsel's preparation and investigation." [52] The hearing was held in November 1974, and three witnesses testified —Dr. Dabney, Mrs. Wood (appellant's mother), and trial counsel. After the trial

court had issued its remand findings,[53] but before a panel decision of this court had issued, this court, *sua sponte*, ordered en banc consideration of the appeal. Since that time appellant has been paroled from Lorton,[54] but his sorry entanglement with the law continues, for he currently faces charges for a felony murder allegedly committed a few months following his parole.[55]

## II.

In *United States v. Decoster* (*Decoster III*)[56] a majority of this court agreed that "[t]he constitutional standard of effective assistance of counsel in a criminal case is

**51.** Prisoner Transfer Findings at 2, 5. Despite this testimony, Judge Block concluded that Wood and the Department of Corrections had not carried their burden of showing by "clear and convincing evidence" that Wood was mentally ill or that he posed a danger to prison routine by virtue of mental illness. *Id.* at 3. *See* 24 D.C.Code § 303(b).

**52.** Remand Order of Sept. 20, 1974.

**53.** *United States v. Wood*, Crim.No. 1261–72 (D.D.C. filed March 26, 1975) [hereinafter Remand Findings]. In reaching her conclusion that "[t]he defendant [had] not carried his burden of showing a substantial violation of any of the duties owed by counsel," *id.* at 5, Judge Green made eight findings of fact concerning defense counsel's pretrial preparations. Most centrally, Judge Green found: that counsel had never before presented an insanity defense (Finding 6); that to prepare himself he read *United States v. Brawner*, 471 F.2d 969 (D.C. Cir.1972) (en banc), a book on trial tactics containing 30–40 pages relating to the insanity defense, and an article from the Criminal Practice Institute Materials (Finding 6); that he contacted the doctors at St. Elizabeths and asked them for (a) their previous diagnosis of Wood, (b) their current diagnosis of Wood, and (c) the reason for change (Finding 7); that counsel spent 2½ to 3 hours reviewing Wood's records at the Hospital (Finding 7); that Dr. Dabney impressed counsel as being "too emotional," so counsel would have preferred using Dr. Kaufman instead as a defense witness, but when Dr. Kaufman returned an unfavorable diagnosis, "the defense was left with only the testimony of Dr. Dabney" (Finding 8); that counsel learned for the first time on the day of trial that Dr. Dabney would not qualify as an expert witness and made the tactical decision not to call Dr. Dabney as a lay witness (Finding 8); that counsel never interviewed Mrs. Wood about her son's behavior or discussed, with her

the possibility of testifying as a defense witness (Finding 10); and, that "Mrs. Wood attended the defendant's trial . . . and indicated that conversations attributed to her by Dr. Robertson at trial were not accurate. . . ." (Finding 11). Judge Green did not reach or make findings on the question of prejudice.

**54.** Jail Records from the District of Columbia indicate that Wood was paroled Nov. 22, 1978.

**55.** The alleged offense occurred on June 2, 1979. Wood was arrested June 6th. As a result of a competency screening examination, a psychiatrist at the Forensic Psychiatry Division of the D.C. Department of Human Resources reported to the superior court that appellant was "psychotic" and "a suicidal risk at present," but competent to stand trial. On the basis of this report, the superior court found Wood *not* to be competent and referred him to St. Elizabeths for further evaluation.

After examining appellant, St. Elizabeths informed the court by letter that he was competent to stand trial and that the offense, if committed by him, was not due to mental illness. The Hospital's letter continued, however, that "from a review of the patient's past hospitalization at this Hospital, reports of behavior while at Lorton, information from his family, psychological evaluation, and the patient's own reports of his past life, it is our impression that he does have a schizophrenic mental disorder and that that disorder, has, at times in the past, impaired his judgment and behavior controls." Letter dated Sept. 7, 1979 from Charles Meredith, Superintendent, St. Elizabeths Hospital, to the Clerk, Crim. Division, Superior Court of the District of Columbia. On September 25, 1979, after his return to the Department of Corrections, Wood attempted to take his own life and was placed under observation.

**56.** 624 F.2d 196 (D.C.Cir., 1979) (en banc).

the reasonably competent assistance of an attorney acting as the defendant's diligent, conscientious advocate." [57] The record presently before us clearly demonstrates that appellant was denied such assistance.

The remand proceedings disclose that to substantiate the defense's theory that the St. Elizabeths doctors had changed their diagnosis solely to rid themselves of a difficult patient, counsel did the following: he spoke for "five or ten minutes" with Dr. Robertson,[58] the doctor primarily responsible for the April 1972 report in which the Hospital changed its diagnosis,[59] and by telephone or in chance courtroom meetings with three other doctors from the Hospi-

tal[60] and the court's psychiatrist, Dr. Kaufman.[61] Counsel also testified that he reviewed Wood's Hospital records for a few hours.[62]

The patent inadequacy of counsel's effort[63] plainly appears from the failure to elicit the critical fact that two of the St. Elizabeths doctors had changed their own diagnoses of Wood long before his second elopement.[64] Moreover, although "[i]t has long been the rule in this circuit, and in most jurisdictions, that lay persons may testify as to the insanity of an individual," [65] counsel never interviewed Wood's family and the hospital nurses who had observed Wood's behavior before and after the es-

---

57. Statement of Wright, C. J. (for three members of the court). *See* Opinion of MacKinnon, J. (for three members of the court), at 222 ("[The *Decoster* panel decision] stated that under the Sixth Amendment an attorney has a duty to his client to be a diligent and conscientious advocate and to provide reasonably competent assistance. This standard of conduct is almost self evident."). The formulation of this standard offered by today's majority stresses the duty of reasonable competence, but neglects to mention counsel's obligation to serve his client with diligence and conscientiousness. *See* Maj.Op. at 559.

58. R. Tr. at 184.

59. *See* note 24 *supra.*

60. R. Tr. at 124–25; *id.* at 183–85. Counsel's CJA voucher form indicates that he spent a total of one hour interviewing witnesses in preparation for trial. *Id.* at 185–86.

61. R. Tr. at 150–52.

62. R. Tr. at 123–24.

63. Trial counsel served as a court-appointed attorney and thus was dependent upon government reimbursement for the time spent preparing his client's defense. *See* 18 U.S.C. § 3006A(d) (1976). Although there is no evidence in this record that counsel curtailed his efforts because of fear that he would not be adequately compensated, this court has reviewed complaints in the past that some judges administering the Criminal Justice Act have arbitrarily reduced fees claimed by attorneys, thereby limiting their incentive to provide indigents with adequate legal representation. *See Camenisch v. United States*, 553 F.2d 1271 (D.C.Cir. 1976) (en banc) (Statement of Chief Judge Bazelon as to Why He Would Grant Rehearing En Banc).

64. At trial, counsel was caught unprepared when, on his own questioning, Dr. Robertson stated that the April 25, 1972 report was not the first time he had expressed the view that Wood was not suffering from mental illness. Tr. II at 147, 171–72:

Q. In the report of April 25, 1972, where you changed your diagnosis, did you . . . indicate . . . that you were, for the first time giving your opinion that [Wood] suffered from no mental disease or defect February 28th [1972].

A. No, that is not true.

Q. Well, I am sorry.

A. We had a conference the preceding year . . . in July of 1971. . . . Dr. Bauer and I both thought at that time that he had no mental illness.

Similarly at trial counsel appeared unprepared for Dr. Bauer's testimony that he had also changed his diagnosis of Wood months prior to the second elopement. Tr. I at 82–84.

Counsel testified on remand that in preparing for trial he had reviewed appellant's hospital records and asked each of the St. Elizabeths doctors for their previous and current diagnoses of Wood and the reasons for their change in diagnosis, R. Tr. at 123–24, 183. Nevertheless, at trial Dr. Robertson produced written materials from as early as July 1971 to show that both he and Dr. Bauer thought even then that Wood was free from mental illness. Tr. II at 172–73. Because it was not established at trial or on remand whether these written materials were part of the hospital record reviewed by counsel, it is impossible to determine whether counsel had read them and failed to appreciate their significance, or whether in interviewing Drs. Robertson and Bauer he had simply failed to probe the critical issue of when these doctors had changed their diagnoses.

65. *United States v. Pickett*, 470 F.2d 1255, 1257 (D.C.Cir. 1972) (citations omitted).

cape.[66] This proved particularly damaging as to appellant's mother, Mrs. Wood:[67] although Dr. Robertson testified at trial that he changed his diagnosis because Mrs. Wood had told him her son did not exhibit symptoms of mental illness at home,[68] on remand Mrs. Wood testified that "there's quite a bit of [Dr. Robertson's testimony] that was not true,"[69] and recounted numerous incidents of her son's unprovoked violence and abnormal behavior at home.[70]

While counsel's conduct thus casts doubts on his diligence, his total unfamiliarity with forensic psychiatry puts into question whether even due diligence would have enabled him to render reasonably competent assistance in this case. This was counsel's first presentation of an insanity defense.[71] Yet, he neglected to take any steps to compensate for his lack of experience with the mental health issues comprising the focal point for both prosecution and defense. He did not consult any psychiatric literature[72] nor did he seek expert assistance, either from a psychiatrist[73] or from a more expe-

**66.** Counsel's decision not to interview lay witnesses is not supported by the record. At the remand hearing counsel stated that he did not interview Mrs. Wood because, on the basis of social workers' files he reviewed at the Hospital, he determined that any testimony she might have to offer was dated and, in any event, could be presented to the jury more effectively through expert witnesses. R. Tr. II at 139–40, 195–96. Similarly, at remand counsel stated that he did not interview any of the St. Elizabeths nursing personnel because he had reviewed their observations recorded in files at the Hospital and decided that he "could bring out [the bizarre behavior they witnessed] through the expert witnesses." R. Tr. II at 198.

The fact that Mrs. Wood's recorded observations were out of date should have suggested a *greater*, rather than a lesser, need to interview her, particularly because during her son's elopement from the Hospital she "saw him in the neighborhood frequently." R. Tr. I at 64. More generally, once having discovered records indicating that Wood's family and the hospital nurses had witnessed bizarre behavior by Wood both inside and outside of the Hospital, *see, e. g.*, R. Tr. at 198, counsel should have sought out these witnesses to determine whether they had further evidence helpful to the defense not reflected in these records. Although counsel's reasoned and informed judgment that a witness' testimony would not aid the defense may justify not calling that witness to testify, it cannot excuse the failure even to interview him.

**67.** Prior to trial, counsel spoke with appellant's mother for 15 or 20 minutes about "[h]ow things . . . were going as far as the court was concerned," R. Tr. at 61, 64 (testimony of Mrs. Wood); R. Tr. at 195–96 (testimony of trial counsel), but the subject of her son's mental history or condition was not discussed. *Id.*

**68.** R. Tr. II at 165, 167, 170. *See* note 24 *supra*. Dr. Robertson also testified that Wood's sister failed to confirm the presence of any symptoms of illness. *Id.* Because Wood's sister did not appear at the remand hearing we do not know if she would have acquiesced in Dr. Robertson's description of her remarks to him.

**69.** R. Tr. at 65–66. Mrs. Wood also questioned whether all the conversations Dr. Robertson reported had ever taken place.

**70.** R. Tr. at II at 79–109.

**71.** R. Tr. at 188–89. Counsel also testified on remand that he had no training in psychiatry. R. Tr. at 179–80.

**72.** *Compare* G. Shadoan, *Law and Tactics in Federal Criminal Cases* 253–54 (1964) (text consulted by counsel):

Before attempting to present to the jury the effect of a particular mental illness upon a defendant's personality and behavior, counsel should be familiar with the clinical manifestations of the disease in its classical form as well as its effect on this particular individual. This knowledge is essential to proper preparation of the direct and cross-examination.

**73.** The courts have "long recognized a particularly critical interrelation between expert psychiatric assistance and minimally effective representation of counsel." *United States v. Edwards*, 488 F.2d 1154, 1163 (5th Cir. 1974). *See, e. g., Davis v. Alabama*, 596 F.2d 1214, 1219 (5th Cir. 1979) (failure to secure psychiatrist to assist in preparation of defense constituted ineffective assistance); *United States v. Fessel*, 531 F.2d 1275 (5th Cir. 1976) (same). *See also* J. Ziskin, Coping with Psychiatric and Psychological Testimony (1975), Goldstein & Fine *The Indigent Accused, The Psychiatrist, and the Insanity Defense*, 110 U.Pa.L.Rev. 1061, 1064–65 (1962). *Cf.*, 50 Pa.Cons.Stat. §§ 7304(d), 7402(f) (providing right to assistance of "expert in mental health" during involuntary commitment and competency proceedings). Such assistance is necessary not only to develop possible evidence helpful to the defense, but also to ensure that the jury learns

rienced attorney.[74]  Thus, whether through lack of sophistication in the mental health field or simply insufficient effort, counsel was completely unprepared to examine the medical support the psychiatrists offered to explain their changed diagnoses.[75]

"the reasons, the factors, the symptoms and the medical reasoning which led to the [experts'] conclusions so that from the experts the jury will have a psychological profile of the accused and not simply a collection of psychiatric labels and technical jargon." *Heard v. United States*, 348 F.2d 43, 45 (D.C.Cir. 1964).

In the present case, counsel testified that he never considered filing a motion for a defense psychiatrist under 18 U.S.C. § 3006A(e), which provides funds for defendants financially unable to obtain expert services "necessary for the defense." R. Tr. at 147. *See United States v. Chavis*, 476 F.2d 1137 (D.C.Cir. 1973); *United States v. Theriault*, 440 F.2d 713 (5th Cir. 1971); *United States v. Tate*, 419 F.2d 131, 132 (6th Cir. 1969) ("[The] Congressional purpose in adopting this statute was to seek to place indigent defendants as nearly as may be on a level of equality with nonindigent defendants in the defense of criminal cases.").

Also, although assistance for the defense might have been available from Dr. Dabney, the private psychiatrist retained by Mrs. Wood during 1971 and 1972 for a $300 fee, *see* R.Tr. at 6–8, 58–60, counsel's contacts with Dr. Dabney prior to trial were limited to: a brief phone call in August 1971 in which Dr. Dabney requested counsel to obtain a court order to permit him to visit Wood at the Hospital, R.Tr. at 160; a five or ten minute phone call in late 1972 in which counsel told Dr. Dabney that his testimony would not be needed at trial if Dr. Kaufman's diagnosis proved favorable, R.Tr. 167, 169–70, 175; and, a 15 or 20 minute discussion on the day of the January 1973 competency hearing in which counsel assured himself that Dr. Dabney would testify at trial that Wood was ill and that "the government was trying to railroad him." R.Tr. at 133–34. During these limited contacts, counsel evidently failed to consult Dr. Dabney about either the nature or treatment of Wood's illness. R.Tr. at 178.

Finally, counsel spoke only briefly to Dr. Kaufman, the court's psychiatrist, and spoke to him only about his own diagnosis, R.Tr. at 150–52. Moreover, Dr. Kaufman was not appointed and did not examine Wood until eight months after the escape, nor was he available to provide the full range of services to which the defense was entitled. *See United States v. Chavis, supra*, 476 F.2d at 1141; *United States v. Bass, supra*, 477 F.2d at 725–26.

**74.** *Compare* Disciplinary Rule 6–101 of the American Bar Association's Code of Professional Responsibility:

Finally, counsel's failure to seek a continuance when his only favorable witness was disqualified sealed his client's coffin.  At this point the defense, which carried the burden of proving its case by a preponderance of the evidence,[76] was left with only

A lawyer shall not: . . . Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.

Counsel apparently also did not take advantage of the comprehensive range of advisory services for members of the local bar provided by the District of Columbia Public Defender Service. *See* Young Lawyer's Section, D.C.Bar Ass'n, *Ninth Annual Criminal Practice Institute: Criminal Practice Manual* 26–27 (1972) (edition consulted by trial counsel).

It bears emphasis, however, that the root of the problem in this case may actually lie in the original appointment of trial counsel to handle Wood's defense. While counsel's performance might have been entirely acceptable in an ordinary case, the complexity of the issues underlying the insanity defense demanded the appointment of counsel with more experience. Care should be taken to ensure that appointed counsel have the necessary experience to provide effective representation.

**75.** As just one example, Dr. Strawinsky testified at trial that the medication she ordered for appellant in August 1971 normally enables schizophrenia patients to return to the community within seven weeks. Tr. II at 134. Since Wood had been taking the medication for nearly seven months prior to his escape, she testified that his illness must have been in remission at the time of his offense. *Id.* at 135. Trial counsel made no effort to probe whether the relationship Dr. Strawinsky described is invariably present in schizophrenic patients, whether Wood was responding in a typical fashion, or, indeed, whether Dr. Strawinsky had any evidence that Wood was actually taking the prescribed medication at the time of his escape. *Compare* F. Redlich & D. Freedman, *The Theory and Practice of Psychiatry* 313–21 (1966) (nonpharmacological factors affecting individual's reaction to drug therapy); DuBose, *Of the Parens Patriae Commitment Powers and Drug Treatment of Schizophrenia*, 60 Minn.L. Rev. 1149 (1976) (effect of drug therapies on schizophrenia varies widely); Tr. II at 212 (testimony by Dr. Kaufman suggesting that Wood may not have been on medication at the time of his escape).

**76.** At trial, appellant was assigned this burden without opposition. *See* 24 D.C.Code § 301(j). *But see United States v. Brawner*, 471 F.2d 969,

the fanciful hope that the St. Elizabeths doctors would impeach their own diagnoses. On remand, when counsel was asked, "Did you contemplate seeking a continuance . . . ?," he answered, ". . . I honestly didn't."[77]

The majority today decides that trial counsel rendered reasonably competent assistance because he harbored a theory before trial that "*might* have been successful."[78] In their view, "*under the circumstances that confronted him*, defense counsel developed a rational theory in an effort to secure an acquittal in the face of adverse medical opinions."[79] This, I submit, begs the very question at issue in this case, for it was defense counsel's own failures which in large measure accounted for the "circumstances" confronting the defense at trial.[80] Or, are we being asked to believe that effective assistance of counsel requires no more than an unsupported defense theory that "might have been successful"?

## III.

In *Decoster III* a majority of this court, through five opinions, agreed that upon finding a denial of effective assistance, a two-step determination is required for re-

---

996 (D.C.Cir.1972) (en banc) (imposition of this burden on federal defendants in the District of Columbia raises substantial constitutional issues); *United States v. Greene*, 489 F.2d 1145 (D.C.Cir.1973) (same).

**77.** R.Tr. at 146–47. Counsel's failure to request a continuance therefore could not possibly have been a tactical judgment. The Government nevertheless argues that defense counsel "might well have been put in a difficult ethical position if, as is now argued, the Sixth Amendment require[d] that he seek out yet another psychiatric opinion," after learning of Dr. Dabney's disqualification. Supp. Memo. of Appellee on Reh. En Banc at 9–10. Leaving aside the fact that counsel's failure to consider a continuance deprived the defense of possible lay testimony and appellant of the opportunity to make an informed decision on whether to go to trial, *see Decoster III, supra*, Dissenting Opinion of Bazelon, J., at 293, on the record before us even this contention by the Government is difficult to understand. While it might be unethical to "shop around" for a sympathetic psychiatrist if there were no good faith basis for asserting an insanity defense, this is not such a case. Appellant Wood was found to have an "inadequate personality" as early as 1968, *see* p. 563 *supra*; was diagnosed as catatonic schizophrenic in 1969, *see* p. 563 *supra*, and in 1970, *see* note 12 *supra*; was acquitted by reason of insanity in November 1970, *see* p. 563 *supra*; was again diagnosed as catatonic schizophrenic in August and December 1971, *see* pp. 564–565 *supra*; was placed in seclusion at St. Elizabeths in April 1972, *see* p. 566, *supra*; and was found mentally ill and dangerous in June 1972, *see* p. 565 *supra*. Given this background, of which counsel should have been aware, it would not only have been ethical for counsel to have sought a favorable expert witness, it was his duty to do so.

**78.** Maj.Op. at 559 (emphasis added).

**79.** *Id.* The majority's approach, if I understand it, seems to rely on rank speculation that a particular theory might have prevailed at trial. I fail to see how this speculation is even relevant to the fundamental question of whether the shortcomings of counsel's representation deprived the defense of a better theory. More generally, because the majority fails to specify any of the basic duties required by the court's standard of diligent, competent assistance, their analysis offers no guideposts for determining when counsel has rendered effective assistance. *Compare Decoster III, supra*, Dissenting Opinion of Bazelon, J., at 275–279.

**80.** Even the "troublesome fact" acknowledged by the majority, Maj.Op. at 559, that trial counsel first learned of Dr. Dabney's credentials on the day of trial, may well have been due to counsel's own failure to interview Dr. Dabney thoroughly in advance of trial. Dr. Dabney testified that he would have told counsel about the charges of incompetency against him if counsel had asked for his qualifications, R.Tr. at 48–49, and the record discloses that counsel's contacts with Dr. Dabney prior to trial were, in fact, quite limited, *see* note 73 *supra*, and did not include preparation for the *voir dire* that would be necessary to establish Dr. Dabney's qualifications as an expert at trial. *See* R.Tr. at 135–36; 191–93. *Compare* the Shadoan text, which counsel says he consulted:

> Whatever counsel's strategy in presenting direct testimony, he should hold one or more mock examination sessions with his psychiatrist in which he will ask the questions he plans to ask on direct and have the psychiatrist give the answers just as he would give them in the courtroom. . . . Counsel should begin by detailing the qualifications of the expert witness.

G. Shadoan, *Law and Practice in Federal Criminal Cases* 259, 270 (1964).

versal:[81] first, that the defendant has shown "likely prejudice";[82] and if so, that the government is unable to prove beyond a reasonable doubt that the constitutional deficiencies of counsel's representation were harmless.[83]

On this record, even without examining the prejudicial effect of counsel's failure to secure expert assistance in preparing for trial,[84] "likely prejudice" amply appears in counsel's failures to interview Mrs. Wood[85] and to request a continuance.[86] Neverthe-

81. The five separate opinions filed in *Decoster* expressed three different views of when a defendant's conviction must be reversed. Judge Leventhal, writing for himself and Judges McGowan, Tamm and Wilkey, argued that initially a defendant must establish a "likelihood that counsel's inadequacy affected the outcome of the trial." Opinion of Leventhal, J., at 208. In Judge Leventhal's view, the defendant has not made out a constitutional violation until he makes this preliminary showing. *Id.* at 206, 208 & n. 71. Once a constitutional violation is established, it is then incumbent upon the government to demonstrate "that in fact no prejudice resulted[;]" otherwise the defendant's conviction must be reversed. *Id.* at 208.

Judge MacKinnon, joined by Judge Robb and again by Judge Tamm, agreed with Judge Leventhal that a defendant cannot secure relief without first making a preliminary showing of prejudice. Judge MacKinnon described the defendant's burden as the burden of "mak[ing] out a *prima facie* case showing . . . that he suffered unfair prejudice as a result of [his attorney's] breach." Opinion of MacKinnon, J., at 226. *See id.* at 218, 222, 228, 229 & 231–233. Once that showing has been made, "the burden of proceeding shifts to the Government . . . to rebut the evidence presented by the defendant." *Id.* at 232–233. According to Judge MacKinnon, only if the government fails in its rebuttal has a constitutional violation occurred, and only then is the defendant entitled to a reversal of his conviction. *See id.* at 229, 233, 237–238.

Finally, Judge Wright, joined by Judge Robinson and myself, summarized our agreement that a defendant need only show that he has not received the effective assistance of counsel to demonstrate a constitutional violation. Unlike the other members of the court, we would not shoulder the defendant with an initial burden of establishing prejudice. In our view, this is precluded by *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Chief Judge Wright's statement also conveyed our view that once a constitutional violation is shown, "[the defendant's] conviction must be reversed unless the Government proves beyond a reasonable doubt that the ineffective assistance of counsel was harmless." Dissenting Statement of Wright, C. J.

When considered together, the three viewpoints yield the two-step test described in the text.

82. In the context of the present case, today's majority interprets "likely prejudice" to mean

that "[the] appellant must establish some basis for believing that a different kind of preparation would have resulted in the presentation of a contrary line of testimony for the jury's consideration." Maj.Op. at 559. To the extent this formulation avoids the speculation inherent in earlier formulations requiring an inquiry into an "effect on the outcome" at trial, *see Decoster III, supra,* Opinion of Leventhal, J., at 214, it is a step in the right direction. But I submit that a defendant should also be able to meet his burden by showing a likelihood that his attorney's failures precluded an informed decision on whether to seek a plea bargain rather than proceed to trial. *See Decoster III, supra,* Dissenting Opinion of Bazelon, J., at 292–293.

83. *See* Statement of Wright, C. J.; Opinion of Leventhal, J., at 208 n.74. In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court clearly stated that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. at 828.

84. Where counsel fails to secure assistance necessary to investigate and comprehend the issues basic to his client's defense, "it will generally be impossible to know precisely how the proceedings were affected, and the resulting prejudice will be 'incapable of any sort of measurement.'" *Decoster III, supra,* Dissenting Opinion of Bazelon, J., at 292 (quoting *United States v. Hurt,* 543 F.2d 162, 168 (D.C. Cir.1976)).

85. *See* p. 571 *supra.*

86. *See* note 77 *supra.* The majority speculates that it would have been "extraordinarily difficult, if not impossible" at the time of trial to obtain an expert to testify about Wood's condition 14 months earlier. Maj.Op. at 559. As the majority itself notes, however, Dr. Kaufman felt able to comment on Wood's condition at the time of the offense despite the fact that his examination of Wood took place eight months later. *Id.* Moreover, counsel himself stated at the outset of trial that "the defense could have had another psychiatrist" had the court informed it only one month before (in granting the defense's subpoena request) that Dr. Dabney would not qualify as an expert. Tr. I at 7–8. In any event, the evidence of Wood's

less, under our prior remand the district court was not instructed to investigate the question of prejudice, nor did it submit findings on that issue.[87] Also, the test of "likely prejudice" was not established until our recent decision in *Decoster III,* so at the time of remand the defense was not aware of the need to make a preliminary showing of prejudice to secure relief, nor was it aware of the type of evidence required for reversal.[88] Since "neither one judge's surmise nor another's doubt can take the place of proof," [89] I submit that sound judicial administration requires a further remand to address the question of prejudice under the test established by *Decoster III* and clarified by the majority today.

The majority, in contrast, finds that the present record reflects no "likely prejudice," apparently on the ground that trial counsel's errors, no matter how egregious, were vitiated by Dr. Kaufman's testimony that appellant was "sane anyway." [90] But "proof of prejudice may well be absent from the record precisely because counsel has been ineffective." [91] Because defense

counsel was unfamiliar with psychiatry and neglected to retain expert assistance, he was totally unprepared at trial to effectively cross-examine Dr. Kaufman.[92] Moreover, the majority has apparently confused the appellant's burden of demonstrating "likely prejudice" with the government's burden of rebuttal. Under the majority's test, to demonstrate "likely prejudice" a defendant need only establish "some basis for believing that a different kind of preparation would have resulted in the presentation of a contrary line of testimony for the jury's consideration." [93] Dr. Kaufman's testimony is irrelevant to this inquiry, for it relates only to the evidence that was before the jury, and not to the evidence appellant lost because of his counsel's shortcomings.[94]

### IV.

In one of the several proceedings below, Michael Wood cried out, "Judge, why don't you just get a gun and blow my brains out. . . . Just go and get a gun and blow

continuing illness after the offense, *see* pp. 565–566, p. 568, note 55 *supra,* indicates that had counsel sought a continuance he at least would have been able to obtain favorable defense testimony as to Wood's condition between the time of the offense and trial. And Mrs. Wood's testimony on remand reveals the type of lay evidence lost to the defense because of counsel's omissions.

87. Remand Order of Sept. 20, 1974; Remand Findings, *supra* note 53.

88. The remand was ordered pursuant to our first decision in *Decoster* which placed the burden on the prejudice issue entirely on the government and did not specify what evidence was relevant to that determination. *United States v. DeCoster,* 487 F.2d 1197 (D.C.Cir. 1973) (*DeCoster I*) (spelling in original).

89. *DeCoster I, supra,* at 1204.

90. This is implicit in the majority's statement that "Dr. Kaufman's testimony negates the likelihood of any prejudice to the defendant, and indeed fairly establishes that prejudice was improbable." Maj.Op. at 559.

91. *Decoster III, supra,* Dissenting Opinion of Bazelon, J., at 291.

92. This was just part of counsel's broader failure to prepare to deal with any of the expert witnesses. *See* note 75 *supra* and accompanying text. This court has frequently emphasized the need for informed cross-examination to establish the reliability of expert testimony. *See, e. g., Thornton v. Corcoran,* 407 F.2d 695, 702 (D.C.Cir.1969); *Washington v. United States,* 390 F.2d 444, 454 n. 30 (D.C.Cir.1967). *See also Lyles v. United States,* 254 F.2d 725, 735 n. 4 (D.C.Cir.1957) (en banc) (Bazelon, J., dissenting), *cert. denied,* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958).

93. Maj.Op. at 559.

94. At most, it might be argued that Dr. Kaufman's testimony reduces the likelihood that another psychiatrist would have offered a contrary view. But given the obvious and continuing disagreement among the experts who have diagnosed the appellant over the years, this argument lacks force. More critically, Dr. Kaufman's testimony has no bearing on whether different preparation would have brought forward nonexpert witnesses, such as Mrs. Wood, who had important testimony to offer the defense.

my brains out. Then there won't be no problem with me, do you understand." [95] We are too civilized, of course, to do that, instead, we save the likes of Wood to rot in the callous health care and criminal justice systems that we allot to them.

## APPENDIX

### Chronology for Michael Wood from 1967 to 1979

| | |
|---|---|
| Nov. 1967 | Entered military service. |
| Jan. 1968 | Hospitalized for mental illness. |
| July 1968 | Discharged from army for "inadequate personality." |
| Dec. 17, 1968 | Indicted for armed robbery of restaurant. |
| Jan. 21, 1969 | Indicted for armed robbery of grocery store. |
| May 12, 1969 | Guilty pleas in both cases. |
| June 27, 1969 | Committed to St. Elizabeths (St. E's) for observation. |
| May 12, 1970 | Letter from St. E's to district court stating that Wood was "suffering from Schizophrenia, Catatonic Type and as the result of this illness he is incompetent for sentencing" and "would be dangerous to himself and others if allowed to remain at liberty, and should, therefore, remain hospitalized." |
| July 9–10, 1970 | After a hearing, Wood held incompetent for sentencing, guilty pleas withdrawn, and recommitted to St. E's. |
| Sept. 30, 1970 | Letter from St. E's to district court 'stating that "Wood is still suffering from a mental illness, namely, Schizophrenia, Catatonic Type. However, he is now competent for sentencing . . . . Further, on or about October 15, 1968 [restaurant robbery] and November 8, 1968 [grocery store robbery], he was suffering from a mental disease or defect which substantially affected his mental or emotional processes and substantially impaired his behavior controls, and the criminal acts, if committed by him, were causually related to his mental illness." The letter also stated, "continued hospitalization is strongly recommended." |
| Nov. 12, 1970 | After a hearing, Wood held competent to stand trial; on stipulated verdict found not guilty by reason of insanity. |
| Nov. 16, 1970 | Committed to St. E.'s ("Original Commitment"). |
| April 8, 1971 | Letter from St. E's advising district court that Wood left Hospital without permission ("First Elopement"). |
| June 8, 1971 | After Wood captured, returned to St. E.'s. |
| June 29, 1971 | Indicted for two robberies allegedly committed while at large. |
| August 6, 1971 | Letter from St. E's to district court reporting results of medical staff conference: "[Wood] is incompetent for trial . . . is suffering from a mental illness, namely, Schizophrenia, Catatonic type, and . . . was suffering from said illness at the time of the alleged offense[s]." |
| Dec. 15, 1971 | Letter from St. E's to district court reporting results of a second medical staff conference: "[Wood] has been diagnosed Schizophrenia, catatonic type . . . . is competent |

**95.** S.Tr. at 28 (statement of Michael Wood as he was being physically restrained by a deputy marshal).

for trial . . . [and on] the date of the alleged offense . . . was suffering from a mental disease which substantially impaired his behavior controls, and the alleged offense, if committed by him, was the product of his abnormal condition."

| | |
|---|---|
| Feb. 3, 1972 | District court finds Wood competent to stand trial on charges pending from First Elopement. |
| Feb. 28, 1972 | Wood escapes from Hospital ("Second Elopement"—underlies current appeal). |
| April 4, 1972 | After capture, Wood returned to St. E's and placed in seclusion. |
| April 17, 1972 | St. E's requested by district court to make new determination of competency. |
| April 25, 1972 | Letter from St. E's to district court reporting Dr. Robertson's findings: "[Wood] has been diagnosed No Mental Disorder and is competent for trial. . . . Furthermore, now and on or about February 28, 1972, the date of the alleged offense, he had no mental disorder that substantially affected his mental process or substantially impaired his behavior controls, and the alleged offense, if committed by him, was not a product of an abnormal mental condition." |
| May 3, 1972 | Letter from St. E's to district court requesting Wood's unconditional release from original commitment because "Mr. Wood has recovered his sanity and will not be dangerous to himself or others within the reasonable future by reason of mental disorder." |
| June 7, 1972 | After a hearing, Hospital's motion for unconditional release denied by district court on ground that Wood still mentally ill and dangerous. |
| June 15, 1972 | Wood indicted on four counts arising from Second Elopement. |
| June 21, 1972 | After a hearing, Wood's motion to end seclusion at St. E's denied by district court because "the Court . . . heard nothing that indicates that the steps that are being taken by St. Elizabeths Hospital are not in accord with what they know of the condition of this patient and what his propensities are." |
| June 22, 1972 | Wood assigned trial counsel whose conduct he challenges. |
| Oct. 6, 1972 | Dr. Kaufman appointed by court to examine Wood. |
| Nov. 29, 1972 | Letter from Dr. Kaufman to district court stating that Wood competent to stand trial and sane as of Second Elopement. |
| Jan. 25, 1973 | After a hearing, district court finds Wood competent to stand trial. |
| April 12–13, 1973 | Wood tried on charges stemming from Second Elopement. Found guilty on two of four counts. |
| April 17, 1973 | Letter from St. E's to district court again requesting unconditional release from Nov. 16, 1970 commitment. |
| May 16, 1973 | Wood sentenced in April 13, 1973 conviction. |
| May 24, 1973 | Conviction and sentence appealed. Pleads guilty to assault with a deadly weapon charge arising out of altercation at Hospital following his return from Second Elopement. |

| | |
|---|---|
| July 3, 1973 | After a hearing, Hospital's motion for unconditional release from Nov. 16, 1970 commitment granted. |
| July 11, 1973 | Wood sentenced in May 24, 1973 conviction for assault with a deadly weapon. |
| July 23, 1973 | On motion of government, indictments stemming from First Elopement dismissed. |
| Jan. 24, 1974 | Superior Court orders Wood returned to St. E's after finding him to be mentally ill and in need of treatment. |
| Sept. 20, 1974 | Panel of this court remands record in Wood's appeal from April 1973 conviction to the district court "for a supplemental hearing on trial counsel's preparation and investigation." |
| March 26, 1975 | District court issues its findings on remand. |
| August 18, 1976 | Superior Court orders Wood returned to Lorton despite testimony from three psychiatrists that Wood had not yet recovered. ' |
| March 17, 1977 | Wood's appeal from April 1973 conviction ordered to be considered en banc by this court. |
| Nov. 22, 1978 | Wood paroled from 1973 convictions. |
| June 7, 1979 | Wood sent to D.C. Jail, charged with felony murder. |
| June 14, 1979 | Wood committed to St. E's for pre-trial examination. |
| Sept. 7, 1979 | Letter from St. E's to Superior Court reporting that Wood is competent to stand trial; that the crime if committed by him, was not due to mental illness, but that Wood "does have a schizophrenic mental disorder and that that disorder has, at times in the past, impaired his judgment and behavior controls." |
| Sept. 25, 1979 | After his return to the D.C. Jail, Wood attempts to commit suicide and is placed under observation. |