**UNITED STATES of America**

v.

**Alan HINTON, Appellant.**

**No. 76–1014.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 20, 1976.

Decided May 13, 1980.

---

Martin D. Minsker, Washington, D. C. (Appointed by this Court) for appellant.

Douglas J. Behr, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, William D. Pease and Roger M. Adelman, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before WRIGHT, Chief Judge, BAZELON, Senior Circuit Judge and ROBINSON, Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

Appellant, Alan Hinton, was convicted after a jury trial of various offenses committed in connection with an armed bank robbery.[1] At a suppression hearing on the morning of trial, the government for the first time presented Hinton's trial counsel with a mass of Jencks Act materials.[2] Hin-

---

1. Appellant was indicted for bank robbery while armed (18 U.S.C. § 2113(d)), bank robbery (18 U.S.C. § 2113(a)), possession of an unregistered firearm (26 U.S.C. § 5861(d)), possession of a firearm not identified by serial number (26 U.S.C. § 5861(i)), and for unauthorized use of a motor vehicle (22 D.C. Code § 2204). He was convicted on all counts except bank robbery.

2. See 18 U.S.C. § 3500. The prosecutor stated:
 Your Honor, for the record, I have just turned over to counsel all of the Jencks material that we have, and if I may state what that is.
 It is two pages of a mobile crime laboratory report of March 18, 1975; one page of a mobile crime report of that date; an FBI report dated July 16, 1975; statements of the witness Vaughn and the witness Holbrook; the preliminary hearing transcript; two grand jury transcripts, one of April 29, 1975, and one May 20, 1975; pages 1 through 7, 12, and 15, and 19 of the FBI report dated April 20, 1975; a police department report dated April 30, 1975; an FBI report dated April 18, 1975, containing—or the pages 2 to 7, 12 to 16, 22 to 30, 32 and 41; a four-page Robbery Squad report prepared on March 28, 1975; the three lineup sheets prepared April 17, 1975; the police form 163 prepared on March 27, 1975; the flash lookout; police form 251, which was a three-page document; 232, which is a one-page document; and 251 re-

ton's counsel did not request a recess to study these documents. On appeal, Hinton argues that his lawyer's failure to use these materials in cross-examining government witnesses at the hearing constitutes ineffective assistance of counsel.[3]

After submission of this appeal, we remanded the record to develop pertinent factual findings.[4] In a supplemental proceeding the district court found that, although appellant's trial counsel sought to read the relevant Jencks Act materials while the suppression hearing was in progress, counsel's decision not to use them was rushed to the point where the court retained "substantial doubt as to whether adequate time existed for . . . an informed decision." The district court also found that appellant had been "prejudiced" by his counsel's failure to bring the Jencks Act material to its attention during the hearing.[5]

The *en banc* opinions of this court in *United States v. Decoster (Decoster III)*[6] and *United States v. Wood (Wood)*[7] were announced after the district court considered this case upon remand. It is now clear that for relief on a claim of ineffective assistance of counsel an affirmative answer is required to the following three questions:

(1) Has there been a substantial breach in the duty owed to the defendant by competent counsel?

(2) Has the defendant demonstrated a likelihood that counsel's inadequacy prejudiced his defense?

(3) Is the government unable to prove beyond a reasonable doubt that the constitutional deficiencies of counsel's representation were harmless?

■ In short, once the defendant has demonstrated a denial of effective assistance resulting in "likely prejudice," the government has an opportunity to prove beyond a reasonable doubt that counsel's deficiencies were harmless.

At the proceeding upon remand in this case, both the trial judge and counsel acted without the benefit of the *Decoster III* and *Wood* opinions. None of the parties was aware of the defendant's burden in demonstrating prejudice ("likely prejudice" to his defense), and it is not clear that the parties were aware that once a constitutional violation had been established, the government could attempt to avoid reversal by establishing beyond reasonable doubt that counsel's inadequacies were harmless. Further, it is uncertain how the district court's finding of "prejudice" should be interpreted in light of the subsequent *Decoster III* test. Therefore, based upon the findings of the district court presently before us, we find that appellant was deprived of the informed and deliberate judgment of counsel. However, we remand the record for the limited purpose of allowing the court and the par-

---

lating to the theft of the car; several property sheets. I shan't go over the numbers of those, your Honor, but they are all relating to the property in this case.

Three pages of reports regarding fingerprints; a two-page report regarding ballistics; and a small copy of a diagram made up by the mobile crime laboratory in connection with this case.

Trial Tr. 14–15.

3. Hinton also argues that his trial counsel's failure to use these materials at trial constitutes ineffective assistance. We reject this contention, *see* note 36 *infra*. We do not reach the merits of Hinton's further claim that the trial court erred in admitting the contested evidence at trial.

4. By an Order and Memorandum dated March 23, 1977, we requested the district court to make factual findings "addressed—but not nec-

essarily limited—to (1) why counsel did not request a recess; (2) whether counsel ever read the Jencks Act materials; (3) if so, at what point in the proceedings; (4) if so, why counsel did not refer to them in cross-examining the identification witnesses; and (5) to what extent, if at all, appellant was prejudiced at the suppression hearing and at the trial by counsel's omissions." *Id.* at 2.

5. Findings of Fact on Remand (FFR) at 5 n.8 & 8–9.

6. *United States v. Decoster,* 624 F.2d 196 (D.C. Cir. 1979) (en banc) *[Decoster III].*

7. *United States v. Wood,* 628 F.2d 554 (D.C.Cir. 1980) (en banc) *[Wood].*

ties to address in light of *Decoster III* and *Wood* the extent of the prejudice to the defendant's case caused by this inadequacy.

## I.

Sometime between 8:00 a. m. and 9:30 a. m. on March 18, 1975, an aqua-colored 1963 Chevrolet was taken without permission from a lot behind a garage at 66 Hanover Place, where mechanic Isaac Thomas Vaughn parked customers' cars waiting to be repaired. About 9:15 that same morning, four men wearing ski masks entered and robbed the American Security and Trust Branch at 2300 Calvert Street. Two robbers vaulted the tellers' counter and began emptying the cash drawers. The other two stationed themselves in the lobby—one (who wielded a sawed-off shotgun) by the desk of Ms. Ellen Hammeke, a customer service representative positioned near the bank's front door; the other (who carried a handgun) beside the desk of Ms. Beverly Emamali, also a customer service representative. Within one or two minutes of entering the bank,[8] the robbers had ordered everyone present to lie on the floor. After taking $6927, the robbers fled through the rear door. Three bank employees heard one departing robber shout, "Come on! Come on, Blue!"[9] The robbery lasted 4 to 10 minutes.[10]

Several employees of J. M. Chambers and Co., which occupied the offices directly above the bank, had become suspicious when they heard loud noises below. Looking out the office's rear window, Ms. Bernice Falwell observed an aqua-colored car with flashing lights in the bank's parking lot and recorded its license number. The same car, which proved to be the one stolen from Vaughn's repair lot, was found later that morning at 3220 17th Street with a sawed-off shotgun in the rear seat.

On the day of the robbery, police and FBI investigators interviewed three witnesses who would later identify Hinton at trial as the robber who wielded the shotgun. Notes made by Officer Joseph Kaclik of the Police Department quote Ellen Hammeke as describing one suspect as a "Negro male, 5'9", 235, 240, heavy face, very stout, wearing a navy or black raincoat, dark pants, with sawed-off shotgun. Also wore a red, yellow, and white ski cap with holes for eyes." Trial Tr. 112. His notes, which he thought reflected "all of the investigation that was done by the Police Department on the 18th," *id.* at 113–14, recorded no descriptions of this robber given by Ms. Emamali or by Mr. Hugh Smith, a teller who was behind the counter during the robbery. *Id.*

An FBI report, a Form 302, reports an interview with Ms. Emamali on the same day. It gives a fairly detailed description of the handgun-toting robber who stood nearest her,[11] but records no description for the other robbers: "Mrs. EMAMALI stated that she could not provide any other description . . . due to the fact that she was on the floor and only got a slight glance of unknown subjects two, three, and four." A second form 302 reports an interview with teller Hugh Smith. It provides a

---

**8.** Mr. O'Connell, the bank manager, testified that the period was 1 minute, Trial Tr. 201; Ms. Hammeke testified 2 minutes, *id.* at 214; Mr. Smith, a teller, testified 1 to 1½ minutes, *id.* at 243; Ms. Emamali testified 2 minutes, *id.* at 264.

**9.** Ms. Emamali testified: "I thought, like I heard something like—like it sounded like you hear somebody down the hall, kind of a distance away, 'Come on, Blue man,' or 'Come on Blue,' something like that." Trial Tr. 257–58.
 Ms. Thomas, a teller testified: "They said something like, 'Come on! Come on, Blue!' The name sounded like Blue to me." *Id.* at 276.
 Ms. Norris, a teller, testified: "Apparently, after the guys, the two left the teller line, and, you know, were on the other side of the windows in the lobby, they were on their way out

of the door, and I could tell because one of them yelled something out . . . .. He said, 'Come on, Blue, let's go.'" *Id.* at 285.

**10.** Ms. Hammeke estimated the robbery at 10 minutes, Trial Tr. 206; Ms. Emamali estimated it at 5 to 7 minutes, *id.* at 43; Mr. Smith estimated it at 4 to 5 minutes, *id.* at 70.

**11.** According to the 302, Ms. Emamali described this robber as "Negro male, 30 years old, short and stocky, about five feet six inches to five feet seven inches, silver small gun." She stated that "she might be able to recognize" this robber "due to the fact that his ski mask did not completely cover his face and almost three quarters of his face was visible."

description in some detail given by Smith of the two robbers who vaulted the counter.[12] As for the two robbers stationed in the bank lobby, however, the report states only: "Negro males, nothing further." One of these men, according to Smith, shouted, "Let's go! Let's go!" [13]

On March 25, a week after the robbery and interviews, the police received information that appellant Hinton was one of the bank robbers.[14] After securing a black and white photograph of appellant, Officer Kaclik spent approximately 3 hours that same afternoon and the next morning assembling a photo array with additional photographs from police files. Officer Kaclik then took the array consisting of eight photographs to the bank, where Mr. Smith, Ms. Emamali and Ms. Hammeke were called into the

---

12. The FBI report attributes to Hugh Smith the following descriptions for the two robbers behind the counter: "Number 1—Negro male, 25–30 years, 6 feet or taller, brown-yellow skull cap, dark-knit top, khaki trousers, brown leather work shoes; Number 2—Negro male, 20–30 years, 6 feet, dark."

13. A report described by the prosecutor as a "flash lookout," Trial Tr. 15, dated March 18 and signed "Kaclik," carries slightly different information, apparently attributed to Hugh Smith. It describes by number five robbers, the first two of whom vaulted the counter: "# 1 N/M, 19 YRS, $5/11$, SLIM, WEARING KNIT CAP–RED, BLACK TRENCH COAT NFD. ARMED WITH SILVER PISTOL. # 2N/M, 18 YRS, $5/10$, SLIM, SHORT HAIR, BRN SKI MASK. ARMED WITH SILVER PISTOL. # 3, 4, & 5 SAME GEN. DESC." One of the robbers—apparently one of those behind the counter—is quoted as saying, "Come on. Comeo on [sic]."

There is in addition a D.C. Police "Report of Crime Against Person or Property" naming Hugh Smith as the "reporting person" and signed by an Officer McCarthy or McCauley. According to this report, Mr. Smith offered much the same information as recorded in the "flash lookout"—i. e., that there were five robbers, that one of the two who vaulted the counter said "Come on Come on," and that the three who remained in the lobby were "all about 6 ft slim builds, N/M's/20 yrs wearing knit hats, & ski masks, and light colored trousers."

14. The record is not clear on the source of this information. According to the affidavit accompanying the request for the appellant's arrest warrant, the police "on 3–25–75 received information from a reliable source who has proven his reliability in the past resulting in the arrest and conviction of numerous subjects in US District Court for bank robbery. The source stated that he had personal knowledge that one of the subjects involved in the above robbery was one Alan Hinton and that he heard him talking about it before & after." Affidavit Relative to the Request for a United States Magistrate Arrest Warrant, signed by Joseph T. Kaclik, March 27, 1975.

This informant who had helped convict "numerous" bank robbers never testified in any of the proceedings below. Moreover, the police affidavit seems to be contradicted by statements of the prosecutor. At the pretrial hearing he proffered the testimony of Officer Thomas (who finally was not permitted to testify by the trial judge), stating:

Officer Thomas advised me I think last Friday when he came to see me that he has known the defendant [Alan Hinton] for some time because he has been an officer in the area at a time where the defendant lives. When this robbery occurred, it occurred on the 18th of March, and Thomas came down to the Police Department a short time later and *looked at the bank surveillance photos*, and I think he looked at four of them. And in the photos was depicted the defendant, and he said he recognized the man. And then I told [defense counsel] as soon as I found out, I think it was that day, then he went out on the street looking around in the area where the defendant lived. And lo and behold, he saw the defendant, and the defendant was wearing a raincoat that he was using, had worn in the robbery, and called him over to the side and said, 'By the way, what is your name?' And he said, 'Alan, Alan Hinton.'

Trial Tr. 8 (emphasis added). And at trial the Prosecutor had the following colloquy with the judge:

The Court: Then after [Officer Thomas] had this conversation with the defendant, what did he do?

Prosecutor: Well, actually, he reported that information back to the Robbery Squad, and *that was the basis upon which they decided to get a warrant and to show his picture.*

The Court: It was on the basis of that that the officers then went to the bank with the pictures?

Prosecutor: That is right. Also, I believe, an informant *saw the photographs* and also indicated that Mr. Hinton was the man in the overcoat.

*Id.* at 314–15 (emphasis added). The bank photographs upon which Thomas and the unnamed informant based their identification of Hinton were not preserved for appeal, nor does the record contain any indication of their clarity.

bank manager's office individually and asked if they could identify any of the bank robbers from the array. Each employee selected the photo of Alan Hinton as the robber with the shotgun.[15]

The next day Mr. Hinton was arrested in front of his home at 39 Hanover Place. He was wearing an overcoat and shoes similar to the coat and shoes worn by the shotgun-toting robber shown in the bank surveillance photographs.[16] It also developed that Mr. Vaughn, from whose nearby lot the getaway car had been stolen, knew Alan Hinton by the name of "Boo."

Three weeks later, on April 17, 1975, Mr. Hinton appeared in a lineup along with seven other black males, all of whom wore ski masks. The three bank employees were again asked individually if they could identify anyone in the lineup. Ms. Emamali and Ms. Hammeke selected Alan Hinton; Mr. Smith selected a different person.[17]

15. When he entered the office, Mr. Smith assumed that a suspect's photo would be in the array, but he was not told which of the robbers to look for. Trial Tr. 89–90. Initially, he chose three pictures from the eight as possibilities, and eventually settled on appellant's on the basis of the contours of the head, the upper body, the shoulders, and the arms—"a general impression of the body build." Id. at 86. Because these features "reminded [him] of the person that [he] observed during the robbery," id. at 92, he told the police, "I believe this to be the man." Id. at 86. When pressed by the court, Mr. Smith stated that he "would be hesitant to make th[e] judgment" that the person he picked out of the photo array was the person who actually robbed the bank. Id. at 92.

According to her testimony at the suppression hearing, Ms. Emamali chose Alan Hinton's picture with considerable reservations:

Well, I can't say exact—I exactly recognize it. I thought it was the same build, the same heavy-set person, the same coloring. . . I said that could have been one of them, or something like that. . . . [I said] that I wasn't absolutely positive but [thought] he has the same maybe size, coloring. I mean, we had, of course, discussed it, and I had remembered saying—giving the description as the guy with the sawed-off shotgun being a heavy-set, dark-skinned man.

Id. at 50–51. At trial she testified that she "picked the picture out and . . . said that that could be one of them, but [she was] not sure." Id. at 265. She recognized him not "personally" but "as a possibility." Id. at 265.

As Ms. Hammeke entered the office to view the photo array, she spoke to one or both of the prior viewers and was told "that they identified someone." Id. at 216. She testified at trial, "I went in with the attitude that there is probably somebody in there who I could identify." Id. at 217. After studying the photographs for 2 or 3 minutes, she "pondered over two"—numbers 7 and 8—"maybe 60 seconds." Id. at 32–33. When asked why she settled on number 8, she responded:

Well, it was the eyes, the coloring of the eyes. The coloring of the skin was much darker as the shotgun man. Also the fullness of the face and the lips, as well. The shaping of the lips.

Id. at 34.

Officer Kaclik, who assembled the array and conducted the identification, also testified at the hearing and the trial. Having made no notes at the identification, he testified from memory and from the allegations appearing in the affidavit for appellant's arrest warrant, which he had prepared shortly after the identification. Id. at 409. According to him, Mr. Smith and Ms. Emamali stated without equivocation that picture number 8 was "identical" to the shotgun robber, id. at 102–03, and Ms. Hammeke said she was "ninety percent sure," id. at 104. He further testified that he asked each witness individually the basis of his or her selection, and all responded that despite the mask, they had been able to see the eyes, nose, and mouth, and "it was this that they identified." Id. at 107.

Although no witness claimed to know of the others' selection before identifying appellant's photograph, they discussed their choices among themselves afterwards and learned that they had all chosen picture number 8. Id. at 60 (Ms. Emamali); id. at 79 (Mr. Smith).

16. The FBI received a laboratory report comparing the clothing worn by Hinton upon his arrest with the clothing worn by the shotgun robber as shown in the bank surveillance photographs. The report stated:

The K–2 overcoat conforms in style, shape, detail and color rendition on panochromatic film with the questioned overcoat in the bank robbery film. There are not any unique characteristics to identify the questioned overcoat to the elimination of all other overcoats of the same style, shape and detail. It was concluded that the K–2 overcoat could be the overcoat depicted in the questioned film. Due to similar and possible diverse characteristics, no conclusion could be reached whether the K–1 shoes are the shoes in the questioned bank robbery film.

Trial Tr. 489.

17. Appellant stood behind shield number 1. Ms. Hammeke testified that she identified num-

On June 13, 1975, defense counsel filed a motion to suppress the identification testimony of these three witnesses. The suppression hearing was held on September 17, 1975, on the morning before trial. At the beginning of the hearing, the prosecutor gave to the defendant's trial counsel Jencks Act materials consisting of approximately sixty loose pages, in addition to bound transcripts of the preliminary hearing and the grand jury testimony of Detective Joseph Kaclik and bank officer Paul R. O'Connell. With the exception of the preliminary hearing transcript, counsel had not received any of the Jencks material prior to that time. FFR at 3. The FBI Form 302's were included in this Jencks Act material,[18] but in turning over the material the government's attorney made no mention that they contained information relevant to the three identification witnesses who were to testify.[19]

Since appellant's trial counsel did not request a recess to study these documents, the district court immediately heard the testimony of the three witnesses, which, in the case of Ms. Emamali and Mr. Smith, differed in significant respects from the 302's.[20]

Ms. Emamali testified that a robber with a silver handgun positioned himself beside her desk; the shotgun robber stood 15 feet away by Ellen Hammeke's desk. Trial Tr. 39–42. When the man guarding Ms. Hammeke ordered her on to the floor, Ms. Emamali also lay down "without anybody telling [her] anything." Id. at 41. From this moment on, she closed her eyes and prayed. Id. at 46–47. Prior to closing her eyes, she observed the shotgun robber for "only a few seconds." Id. at 47. She noticed that "his mouth and nose was [sic] exposed, but his mask kept riding up, and he kept pulling it down."[21] Id. at 254. Although contradicted by the FBI 302 form and Officer Kaclik's notes, Ms. Emamali testified that she had given the police a general description of the robber wielding the shotgun:

> THE COURT: And you say you set the picture aside for what reason?
>
> A. Okay. I looked through the pictures, and I said that could have been one of them, or something like that.
>
> Q. Yes, but what was the basis of it?
>
> A. You mean did I recognize it or—
>
> Q. What was the basis of saying that it could have been one of them?
>
> A. Well, that I wasn't absolutely positive, but that he had the same maybe size, coloring.
>
> I mean, we had, of course, discussed it, and I had remembered saying—giving the description as the guy with the sawed-off shotgun being a heavy-set, dark-skinned man.

ber 1, saying she "was ninety percent sure that he was the man." Trial Tr. 34–35. Ms. Emamali said she also selected number 1, stating "[s]omething [like] it could be number 1, but I am not sure." Id. at 56. Mr. Smith made a "misidentification," choosing number 4. Id. at 76. See id. at 133–38, 416–17.

After the lineup, the three witnesses together evidently discussed their identifications with an unidentified police officer, who informed them that the two women had correctly identified the suspect and that they would be asked to testify at some time in the future. Id. at 63, 78.

**18.** Officer Kaclik's notes had been given to defense counsel at pretrial discovery proceedings. Trial Tr. 119.

**19.** See note 2 supra.

**20.** The testimony of Ms. Hammeke also differed from Officer Kaclik's notes. See note 18 supra. Ms. Hammeke testified that for about half the robbery, the shotgun robber stood guard 5 feet from her. Trial Tr. 21. Although she spent most of this time "on the floor looking up," id. at 206, she had a full view of him. Id. at 215. She stated: "I was able to see the face of the gentleman who was guarding me. He had a ski mask on, but I could see his eyes, and his mouth, and his coloring." Id. at 19. She specifically noted "the fullness of the lips" and "the shape of his face, too, because it was a little bit full." Id. at 215. Although she recalled telling the police about these traits, Officer Kaclik's notes fail to record them. When asked if he recalled Ms. Hammeke's telling him that the shotgun robber "had a full face, and full lips, and dark eyes," he responded, "I don't have it written down here." Id. at 115.

**21.** In the FBI report, Ms. Emamali had apparently ascribed this characteristic to the robber with the silver handgun. See note 11 supra.

Q. To whom had you given that?

A. The police when they asked me.

Q. When was that?

A. The day after the robbery, I think, I can't remember exactly.

Q. Can you tell us as best you can recall what description you gave [of] the man, the sawed-off shotgun man, that is?

A. Heavyset; dark color. I think I told them he had on a black raincoat, sawed-off shotgun.

I can't remember exactly now.

Q. Heavyset, dark color?

A. Right.

Q. What else?

A. Afro. Had an afro. No, I didn't say that because I didn't see his hair. I can't remember exactly, to be honest. I just remember him being a fat fellow.

THE PROSECUTOR: Did you identify him by race at the time?

A. Yeah, Negro. Negro male, I think. I can't remember. I know I saw his nose and his mouth, so I said, "Negro." Of course, I heard him talk.

THE COURT: What, if anything, do you recall saying to the police about his nose or mouth?

A. Nothing. I didn't say anything.

Q. But you saw nothing unusual, so you said nothing about it to the police?

A. Right.

Q. So then the best that you can remember is that he was heavyset and dark color; is that right?

A. Un-huh.

Trial Tr. at 51–53. When asked if she had discussed the characteristics of the shotgun robber with Ms. Hammeke after the crime, Ms. Emamali replied:

I think we discussed everybody. We probably did. We discussed what happened and some of the odd things that happened on that day, and, yeah, we discussed. Everybody discussed him as being the fat guy. Everybody remembered that like it stood out.

Id. at 60.

Hugh Smith testified that there were four robbers, Trial Tr. 231 (not five, as he had originally told the investigators),[22] that he never saw "distinct facial characteristics" of the two masked robbers in the lobby, id. at 70, and that he spent most of the time on the floor behind the counter. Id. at 84. Although he could not describe the shotgun robber's mask, id. at 85, Mr. Smith stated that his "focus" was on that robber, so that his "impressions" of him were "the most valid." Id. at 84. He remembered the robber's silhouette as it appeared 15 to 20 feet away. Id. at 87:

He was standing in front of the glass, so there was the light factor plus the fact that he had a mask over his face . . . [It was a] clear glass, yeah, but there was a bit of a glare, as I remember it, and what I was looking for [at the subsequent photographic identification] was the size of the head, the shoulders, the general characteristics of the body of the person that was involved in the robbery.

Id. at 85. Although not recorded in the 302 form or Officer Kaclik's notes, Smith testified that he had described the robber to the police:

THE COURT: Before you step down, Mr. Smith, on the day of the robbery, did you give a description of any of these persons who were involved to the police?

A. I did.

Q. And of more than one person?

A. I tried to identify the characteristics of, I think, four of the gentlemen that were in the bank at the time.

Q. And do you recall to whom you talked?

A. I spoke with at least five plain clothes men or Federal agents.

* * * * * *

Q. Now can you describe the person who was closer to Ms. Hammeke?

A. My description?

Q. As you gave it to the policemen that afternoon?

A. Obviously, I can't give it to you verbatim.

---

22. See "Flash Lookout" and "Report of Crime Against Person or Property," supra note 13.

Q. Yes.

A. My impression of them was a case involving a heavyset gentleman, large face, more roundish characteristics with an overcoat on with a weapon underneath the overcoat.

Q. Can you describe the overcoat?

A. It was a darkish raincoat type. *Id.* at 81–83.

Appellant's trial counsel did not use the 302's to cross-examine Mr. Smith or Ms. Emamali, either at the suppression hearing or at trial.[23] Nor did she bring them to the attention of the trial judge. The motion to suppress was then denied from the bench without explanation and the trial began immediately thereafter. At trial, each of the three witnesses testified to their prior identifications, and identified the appellant in court as the bank robber who had held the shotgun. Hinton was found guilty on four of the five counts charged,[24] and was sentenced to 10 years' imprisonment on each of three counts and 6 years on the fourth, all to run concurrently.

## II.

On the appeal to this court that followed, Hinton argued that the failure of his trial counsel to request a recess during which she could study the Jencks Act material deprived him of "his counsel's tactical judgment—*informed by the content of the statements*—as to whether or not to cross examine with them."[25] Lacking a sufficient record to pass on appellant's ineffective assistance of counsel claims, we remanded the record to the district court "for an inquiry into the circumstances surrounding trial counsel's decision not to seek a recess and her apparent failure to use these materials in cross-examining the prosecution's three identification witnesses."[26]

After a hearing at which appellant's trial counsel was the only witness, the district court on remand made the following findings: "(1) trial counsel did not request a recess upon receiving the Jencks Act materials because she felt she did not need one; (2) counsel read the 302's of Emamali and Smith prior to her cross-examination of those witnesses at the suppression hearing; (3) the best indications of counsel's reasons for not referring to the 302's on cross-examination are that she felt the statements were not helpful to defendant's case and, in fact, could have been harmful to it; and (4) defendant was prejudiced by counsel's failure to bring the 302's to the attention of the Court and jury." FFR at 2.

In support of its finding that appellant's trial counsel had read the Jencks Act material before her cross-examination of Smith and Emamali,[27] the district court provided the following explanation:

Although [counsel] could not specifically recall having read the materials before cross-examining Emamali and Smith at the suppression hearing, her best recollection was that she had read at least the 302's by that time.

The circumstances of this case seem to support counsel's recollection. Counsel had conducted substantial discovery and was familiar with much of the information contained in the Jencks materials. Only sixteen pages of the materials involved the three identification witnesses, and of that, several concerned the line-up with which counsel was quite familiar. Little time would be required for an experienced criminal trial attorney such as counsel to follow her usual practice of separating the relevant material and quickly reviewing it. Therefore, the Court accepts counsel's best recollection

---

**23.** Only Officer Kaclik's testimony about the content of his notes was introduced into evidence; this testimony was elicited by the trial judge at the suppression hearing, but was not repeated to the jury at trial.

**24.** *See* note 1 *supra.*

**25.** Brief for appellant at 59.

**26.** *See* note 4 *supra.*

**27.** After the testimony of these witnesses a luncheon recess was called, following which oral argument was heard on the motion to suppress. There is no dispute that trial counsel read the Jencks Act materials during this luncheon recess. FFR at 4.

and finds that trial counsel read the 302's of Emamali and Smith prior to her cross-examination of those witnesses at the suppression hearing.

FFR at 5.

The court added in a footnote, however, that "[t]he Court's acceptance of counsel's best recollection . . . is prompted more by counsel's experience, usual practice, and opportunity to view the relatively small amount of relevant material than it is to counsel's hindsight justification for her recollection." *Id.* at 5 n.8. The court also cautioned that "[a]lthough the Court here finds that trial counsel read the 302's prior to cross-examining the identification witnesses, no inference should be derived therefrom that counsel had adequate time to make an informed tactical decision as to the use of the information contained in the 302's. In light of the findings . . . concerning prejudice to the defendant by counsel's omissions, the Court retains substantial doubt as to whether adequate time existed for such an informed decision." *Id.* at 5 n.8.

The image that emerges from these findings and the transcript of the hearings on remand is that of a harried trial attorney, attending to direct examination with one part of her consciousness, and with the other rifling through the "massive Jencks material" (as trial counsel characterized it, *see* Trial Tr. 407), in a hurried attempt to isolate and scan the relevant documents. Appellate counsel's notes, for example, indicate that on April 17, 1976, trial counsel told him she had *not read* the Jencks Act statements of the government's identification witnesses *before these witnesses testified at the motion hearing.* When asked to explain at the remand hearing, trial counsel stated that:

> my recollection about what I told him there is that I got the Jencks Act material that you pulled out once the witnesses are going to testify and, generally, you are not that far ahead that you have read, let's say, all of the next witness' Jencks Act material way ahead. You are just keeping up, really, and you have gone over it to see if there is anything substantial in it, and then you are checking it, with each witness until you have had a chance to go over it completely.

R.Tr., 26 April 1977, at 41–42. Similarly, when appellate counsel asked trial counsel at the remand hearing whether she felt she had adequate time to assimilate the Jencks Act material, the following exchange took place:

Q. Do you recall telling me on April 16, 1976, in our telephone conversation, that you looked at the Jencks Act statements that you were given at the motion hearing, but you had no adequate time to review them?

A. (No response.)

Q. Did you say that to me?

A. I am sure I did.

Q. And is that your testimony today?

A. I don't think you have adequate time if you are doing it on the day of trial.

Even if you ask for a recess and the Judge gives you a recess, you are out there hastily looking at it with the Marshal coming out the door saying, "Are you finished yet? Are you finished yet?"

It simply does not work well to have it given to you on the day of trial.

It can be managed. It usually is reasonably workable, but it is not the opportune way for this to be handled, by any means.

\* \* \* \* \* \*

Q. Is this one of the cases that wasn't workable because you had such a large volume of Jencks Act material?

Is that a fair statement?

A. It was less workable. If it had become totally unmanageable, I would have had to ask for a recess, although it would have interrupted the motion hearing and the continuity of it would have delayed the proceedings.

R.Tr., 15 April 1977, at 24–25.

It is evident that the government's decision to provide the Jencks Act materials for the first time at the suppression hearing placed appellant's trial counsel in a dilem-

ma. The district court on remand found that although trial counsel "did not request a recess because she felt she did not need one," counsel was concerned "that, in general, there was never enough time for an adequate review of Jencks materials when received on the day of trial; and that requesting a recess to study the materials was an unsatisfactory method of dealing with the problem in that it risked antagonizing the Court and disrupting proceedings." FFR at 4. The transcript of the remand hearings vividly portrays counsel's concerns:

APPELLATE COUNSEL: Now, the transcript of the motion hearing reflects no request for a continuance after you received the Jencks Act material and prior to your cross-examination of these witnesses.

Now will you tell us why you did not ask for a continuance to allow yourself more time to study these materials

A. It is not a particularly satisfactory practice in many ways.

As I think I explained previously, without trying to put on the record any impression that I think His Honor hurries or does not give adequate time to every defendant, it does irritate a busy person who wants to get moving with their work to delay it by asking for a recess.

Generally I can handle it. It is not a comfortable process. It is not.

\* \* \* \* \* \*

Q. Would it be fair to say that you concluded that the potential gain from what you might find in the Jencks Act material by further study did not warrant antagonizing the Court by asking for a delay?

A. Among considerations, yes, I think so. It delays the proceedings; it antagonizes; it antagonizes everybody and generally it doesn't come up with that much.

Now, I am not saying that there may not be a time that a gold mine would be missed, and, as I said before, the optimum way to get any benefit from Jencks material is to have plenty of time.

Getting it the night before is a very satisfactory way. You can sit and read it at a leisurely pace, take a break when you feel like taking a break, and get back to it, and mull it over in your own mind.

Even if you read it, sometimes having a chance to think it over gives you a great deal more help, but—

THE COURT: . . . [D]uring the course of this trial, at any time did you feel that the Judge was antagonized by anything you did or said?

A. No, Your Honor, I can't—I know I have in the past antagonized you in some ways.

I have some personal habits, perhaps, that do not please you in the courtroom, yes, but I can't specifically recall any. We live with it.

No counsel is perfect coming before the Judge, and I suppose no Judge is perfect as counsel looks at it, too.

I have no recollection of anything untoward really happening at the trial insofar as antagonisms or—

In fact, I think it was a better-tried case than a good many.

R.Tr., 15 April 1977, at 50–53.

It is to avoid placing defense counsel in dilemmas such as these that the ABA Standards Relating to Discovery and Procedure Before Trial admonish prosecutors to disclose Jencks Act material to defense counsel "as soon as practicable following the filing of charges against the accused."[28] *See United States v. Sebastian,* 497 F.2d 1267, 1270 (2d Cir. 1974). A criminal trial is not

---

**28.** ABA Standards Relating to Discovery and Procedure Before Trial, § 2.2(a) (1970). *See id.* § 2.1(a)(i). The ABA Standards are the product of a comprehensive study by a distinguished committee chaired by the Chief Justice of the United States, and have been approved by the ABA's House of Delegates. They urge early disclosure of materials to the defense in order "to permit thorough preparation for trial and minimize surprise at trial." *Id.* at § 1.1(a)(iii). In this case, although Hinton was indicted on May 22, 1975 and pleaded not guilty on June 6th, his attorney was not furnished the Jencks materials until September 17, 1975.

"a game or sporting contest," but "a serious inquiry aiming to distinguish between guilt and innocence." Williams, *Advance Notice of the Defense*, 1959 Crim.L.Rev. 548, 554. The government's behavior in this case is particularly troubling because (1) the Jencks Act material was voluminous; (2) the government knew in advance it would call these three identification witnesses; and (3) there was no question of the substantial relevance of the 302's.

The government, however, has violated no *legal* obligations to the defendant.[29] Our inquiry is limited, therefore, to whether when placed in this awkward position by the government, counsel responded in a manner consistent with her client's constitutional right to the effective assistance of counsel.

### III.

 Our recent *en banc* opinions in *Decoster III* and *Wood*[30] define ineffective assistance of counsel as a substantial breach in the duty owed to the defendant by competent counsel.[31] While this standard does not require "errorless representation,"[32] it does demand that counsel's choices be "the product of deliberate and informed decision, not oversight or inadvertence."[33] Where counsel's choices are uninformed because of inadequate preparation,[34] or are not "arguably . . . the product of tactical decisions,"[35] a defendant has been denied his right to the effective assistance of counsel guaranteed by the Constitution.

 One of the necessary elements of an informed decision is that "counsel . . .

---

**29.** By its terms, the Jencks Act, unlike the ABA Standards, does not mandate the surrender to defense counsel of Government-held statements of witnesses "until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500. *See, e. g., United States v. Callahan*, 534 F.2d 763 (7th Cir.), *cert. denied* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

**30.** *See* notes 6–7 *supra.*

**31.** In *Wood* this formulation was described by the majority *per curiam* opinion as the outcome of our earlier *en banc* decision in *Decoster III. See Wood, supra*, at 559. We do not believe this formulation differs substantively from the more general formulation first announced by a unanimous panel of this court in *United States v. DeCoster*, 487 F.2d 1197 (D.C.Cir.1973) (*DeCoster I*) (spelling in original), and explicitly reaffirmed by a majority of the full court in *Decoster III*: "A defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate." *See Decoster III, supra*, Statement of Wright, C. J. (for three judges); *Id.*, Opinion of MacKinnon, J. (for three judges), at 222. Regardless of precise formulation, however, it is clearly now accepted in this circuit that counsel is expected to serve with diligence and conscientiousness, and to render assistance that is not seriously incompetent. *See Decoster III, supra*, Opinion of Leventhal, J. (for four judges), at 206 (prohibiting "serious incompetency, inefficiency or inattention"); *Id.*, Opinion of MacKinnon, J. (for three judges, one of whom also joined Judge Leventhal's opinion), at 222 (requiring reasonable competence, diligence and conscientiousness); Statement of Wright, C. J. (for three judges) (same).

**32.** *See Marzullo v. Maryland*, 561 F.2d 540, 544 (4th Cir. 1977) (emphasis added), *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978):

> [E]ffective representation is not the same as errorless representation. An attorney may make a decision or give advice which in hindsight proves wrong. Such errors, as *McMann [v. Richardson]* pointed out, are not necessarily grounds for post-conviction relief. 397 U.S. [759] at 770–71, 90 S.Ct. 1441 at 1448, 25 L.Ed.2d 763 [(1970)] A convict generally must establish that his counsel's error was so flagrant that a court can conclude that it resulted from neglect or ignorance *rather than from informed, professional deliberation.*

**33.** *United States v. Smith*, 551 F.2d 348, 353 (D.C.Cir.1976).

**34.** *United States v. Moore*, 554 F.2d 1086, 1089 (D.C.Cir.1976).

**35.** *United States v. Butler*, 504 F.2d 220, 224 (D.C.Cir.1974). *See United States v. Benn*, 476 F.2d 1127, 1134 (D.C.Cir.1973) (separate statement of Bazelon, C. J.) (footnotes omitted):

> I am well aware that there are dangers in attempting to second-guess the professional judgment of trial counsel. But to make the right to the effective assistance of counsel viable requires some assurance that counsel's trial decisions actually reflect an exercise of his professional judgment. The question is not whether counsel would have done better by different choices, but only whether his trial decisions were informed, deliberate, and rational.

allow himself enough time for reflection and preparation for trial." *Coles v. Peyton,* 389 F.2d 224, 226 (4th Cir.), *cert. denied,* 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968). In this case, although the district court found that appellant's trial counsel looked at the 302's during the suppression hearing, it retained "substantial doubt as to whether adequate time existed for . . . an informed decision" whether to use them in the cross-examination of Smith and Emamali. FFR at 5 n.8. The circumstances surrounding counsel's decision support the conclusion that it was not in fact informed. Counsel was handed *voluminous* Jencks material *at* the suppression hearing. The government made no effort to alert her to the immediate pertinence of the 302's. Counsel then read the materials, as she later stated, *while testimony by the identification witnesses was in progress. See* R.Tr., 26 April 1977, at 41–42.[36]

It is to avoid just this problem that the Jencks Act provides that after material is given to the defense, "the court in its discretion, upon application of [the] defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial." 18 U.S.C. § 3500(c). Counsel conceded at the remand hearing that she did not feel she had adequate time to review the materials, R.Tr., April 15, 1977, at 24–25, yet she did not invoke this provision for a recess. Had she done so, a refusal by the court to allow sufficient time for review would have been appealable as an abuse of discretion.[37]

Whether counsel's failure to request a recess alone rendered her decision uninformed, however, it is quite apparent that she completely failed to appreciate the obvious and crucial legal significance of the 302's. During the suppression hearing, the court was, in its own words, "obviously concerned" with the admissibility of the identifications based on the photo array. FFR at 8. The witnesses had had only brief glimpses of the suspects during the robbery,[38] and all of the suspects had worn masks covering most of their faces.[39] Further, there was a substantial question whether the witnesses had colored each others' memories during their discussions following the robbery.[40] In an effort to determine the basis for the witnesses' selections, the court therefore, on its own initiative, asked the witnesses to provide any descriptions they had given to the police immedi-

**36.** In contrast, prior to trial, counsel clearly had an opportunity to examine the Jencks materials carefully before making a decision whether to use them during cross-examination. *See* note 27 *supra.* On remand, the district court found that counsel decided against referring to the 302's at trial for fear "that the witnesses would [then have an opportunity to] strengthen their tentative identifications of defendant or interject explanations of the emotional upset they felt during the robbery." FFR at 7. Whether or not counsel was correct that these dangers outweighed the probative value of the 302's to the defense, her judgment was clearly the type of tactical choice committed to the informed discretion of defense counsel within the adversary system. Accordingly, we reject that portion of appellant's ineffective assistance of counsel claim directed to counsel's failure to use the 302's at trial.

**37.** *See United States v. Amabile,* 395 F.2d 47, 52 (7th Cir. 1968), *vacated on other grounds sub nom. Giordano v. United States,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); *Moore v. United States,* 394 F.2d 818, 819 (5th Cir. 1968), *cert. denied,* 393 U.S. 1030, 89 S.Ct. 641, 21 L.Ed.2d 573 (1969). Although the trial court did not know the contents of the Jencks materials, it did know they were voluminous. In such circumstances, caution would have been well-served by the entry of a *sua sponte* order for recess to protect the defendant's right to adequate representation and a fair trial. *See Lakeside v. Oregon,* 435 U.S. 333, 341, 98 S.Ct. 1091, 1096, 55 L.Ed.2d 319 (1978) ("It is the judge, not counsel, who has the ultimate responsibility for the conduct of a fair and lawful trial.").

**38.** *See* notes 8 and 10 *supra.*

**39.** In *Simmons v. United States,* 390 U.S. 377, 385, 88 S.Ct. 967, 972, 19 L.Ed.2d 1247 (1968), the Supreme Court emphasized that the presence or absence of masks is a significant factor in assessing the reliability of subsequent identifications based on full-face photographs.

**40.** *See, e. g.,* at pp. 775–776 *supra.*

ately after the robbery.[41] When both Emamali and Smith stated that they had previously given the police descriptions resembling appellant, the court was able to discount, to that extent, the possibility that the composition of the photo array or its presentation was itself responsible for their selections.[42] Furthermore, these uncontroverted prior descriptions bolstered the overall reliability of the witnesses identifications, for the accuracy of a witness' prior description is part of the "totality of circumstances" to be considered in determining the admissibility of identification testimony.[43]

Counsel nevertheless testified on remand that she did not alert the court to the inconsistencies between the testimony of Emamali and Smith and the 302's because she "did not feel that the Jencks material was particularly important." R.Tr., April 15, 1977, at 29. Beyond that, all she could

offer to explain her omission was the hindsight evaluation that perhaps she had feared that introducing the 302's would "clutter up the record," id., or distract attention from the photo array.[44] It is apparent, therefore, that in the rush and confusion of the suppression hearing counsel simply did not appreciate the significance, and in light of the judge's own interest, the critical importance of the 302's. As a result, appellant was deprived of the "informed, professional deliberation" of counsel guaranteed by the Sixth Amendment.[45]

## IV.

In *Decoster III* and *Wood* a majority of this court also agreed that to reverse a conviction on the basis of ineffective assistance of counsel, the defendant must establish that he has suffered "likely prejudice."[46] The burden then falls upon the

---

**41.** The government also elicited testimony on direct examination concerning the witnesses' prior descriptions to the police. *See, e. g.*, Trial Tr. at 22–23, 52.

**42.** *See, e. g.*, the portion of the transcript reprinted at pp. 775–776. It is also recognized that the suggestiveness of a photo array or other out-of-court identification procedures depends in part upon the relationship between the characteristics a witness is searching for and their distribution in the staged array. *See Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification*, 29 Stan.L.Rev. 969, 986–87 (1977) ("If, for example, the witness described the assailant as 'tall,' and only one of the participants in [a] lineup could be considered tall, then the choice of that one individual has little meaning for the purpose of identifying the true criminal."). How, and if, Emamali and Smith had previously described the suspect thus also bore directly on whether the selection of photo's by the police presented a fair array from which the witnesses could choose.

**43.** *See Manson v. Braithwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 194, 93 S.Ct. 375, 379, 34 L.Ed.2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 385, 88 S.Ct. 967, 972, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno*, 388 U.S. 293, 300, 87 S.Ct. 1967, 1971, 18 L.Ed.2d 1199 (1967). In *Biggers* the Court summarized the state of the law at the time of trial in this case:
. . . It is the likelihood of misidentification which violates a defendant's right to due process . . . .

---

* * * * * *
. . . As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, *the accuracy of the witness' prior description of the criminal,* the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
409 U.S. at 198–99, 93 S.Ct. at 381–382 (emphasis added).

**44.** Counsel could not actually recall on remand why she had failed to refer to the 302's during the suppression hearing. FFR at 5–6. She suggested, however, that she may have felt "[t]he introduction of the witnesses' possible failure to give detailed contemporaneous descriptions would only have detracted from [her] emphasis on the photo array." FFR at 6. Although the trial court found that "[t]he record discloses little independent support for counsel's rationale," it nevertheless "accept[ed] counsel's hindsight evaluation as the best indication of her reasons for not referring to the 302's on cross-examination at the hearing." *Id.*

**45.** *See Marzullo v. Maryland*, 561 F.2d 540, 544 (4th Cir. 1977), *cert. denied*, 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978).

**46.** *See Decoster III, supra*, Opinion of Leventhal, J. (for four judges), Slip Op. at 21; *id.*, Opinion of MacKinnon, J. (for three judges), Slip Op. at 19; *United States v. Wood, supra*, Slip Op. at 10.

government in accordance with *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), to prove "beyond a reasonable doubt" that the constitutional deficiencies of counsel's representation were, in fact, harmless.[47]

Because the hearings on remand in this case were conducted prior to our decision in *Decoster III*, the parties did not have an opportunity to address the question of prejudice in light of these principles. It is also not clear how the district court's finding of "prejudice" should be interpreted. The district court found that the appellant was prejudiced in two respects by trial counsel's failure to bring the 302 statements to the attention of the court at the suppression hearing.[48] First, the court found that "had that information been made available, it *might* have suppressed the photo array as well as the testimony of Emamali and Smith." [49] This could be considered a ruling on "likely prejudice," but the court does not reveal what standard it relied upon in reaching its conclusion. The court's second finding appears in a footnote, where the court states: "[I]n a case such as this, where circumstantial evidence provides the proof of defendant's guilt, the introduction of the testimony of Emamali and Smith [at trial] cannot be considered harmless." [50] This would appear to be a ruling on harm-less error, thus encompassing both of the steps with respect to prejudice required by *Decoster III* for reversal. But, again, it is not apparent what standard the court applied in reaching its finding. More importantly, this ruling was made by the court without benefit of argument from the parties.[51]

Rather than speculate as to the meaning of the district court's findings, we remand the record for clarification. In accordance with the principles of *Decoster III* and *Wood*, the court should consider whether the defendant has established a "likelihood" that his counsel's inadequacy prejudiced his defense, and whether the government can demonstrate beyond a reasonable doubt that the deficiencies were harmless.

*Record remanded for further proceedings consistent with this opinion.*

---

**47.** *See Decoster III, supra*, Statement of Wright, C. J. (for three judges); *id.*, Opinion of Leventhal, J. (for four judges), Slip Op. at 21 n.71; *United States v. Wood, supra*, Opinion of Robinson, J., Slip Op. at 1–2; *id.*, Opinion of Bazelon, J., Slip Op. at 26–28.

**48.** The court also ruled that "since [the jury was] instructed to consider prior descriptions in determining the credibility of the identification witnesses . . . counsel's failure to present the 302's to the jury must also be considered prejudicial." FFR at 9. Because we find that counsel's omission at trial was "arguably . . . the product of tactical decisions," *see* note 36 *supra*, the district court need not reconsider this finding of prejudice.

**49.** FFR at 9 (emphasis added).

**50.** *Id.* at n.12.

**51.** On the original remand, both parties addressed only the question of whether omissions at the suppression hearing had a prejudicial effect *on the trial court's disposition of the motion*; they did not consider whether the introduction of the contested evidence at trial was harmless. *See* Defendant's Proposed Findings of Fact Pursuant to Court of Appeals Remand Order and Defendant's Memorandum in Support of Proposed Findings of Fact Pursuant to Court of Appeals Remand Order, May 31, 1977; Government's Proposed Findings of Fact, May 31, 1977; R.Tr., June 10, 1977, at 26–32, 38–46.